(Slip Opinion) OCTOBER TERM, 2005 1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## DAVIS *v.* WASHINGTON

### CERTIORARI TO THE SUPREME COURT OF WASHINGTON

No. 05–5224.  Argued March 20, 2006—Decided June 19, 2006*

In No. 05–5224, a 911 operator ascertained from Michelle McCottry that she had been assaulted by her former boyfriend, petitioner Davis, who had just fled the scene.  McCottry did not testify at Davis's trial for felony violation of a domestic no-contact order, but the court admitted the 911 recording despite Davis's objection, which he based on the Sixth Amendment's Confrontation Clause.  He was convicted.  The Washington Court of Appeals affirmed, as did the State Supreme Court, which concluded that, *inter alia,* the portion of the 911 conversation in which McCottry identified Davis as her assailant was not testimonial.

In No. 05–5705, when police responded to a reported domestic disturbance at the home of Amy and Hershel Hammon, Amy told them that nothing was wrong, but gave them permission to enter.  Once inside, one officer kept petitioner Hershel in the kitchen while the other interviewed Amy elsewhere and had her complete and sign a battery affidavit.  Amy did not appear at Hershel's bench trial for, *inter alia,* domestic battery, but her affidavit and testimony from the officer who questioned her were admitted over Hershel's objection that he had no opportunity to cross-examine her.  Hershel was convicted, and the Indiana Court of Appeals affirmed in relevant part.  The State Supreme Court also affirmed, concluding that, although Amy's affidavit was testimonial and wrongly admitted, it was harmless beyond a reasonable doubt.

*Held:*

  1. The Confrontation Clause bars "admission of testimonial statements of a witness who did not appear at trial unless he was un-

_____

  *Together with No. 05–5705, *Hammon* v. *Indiana,* on certiorari to the Supreme Court of Indiana.

available to testify, and the defendant had a prior opportunity for cross-examination." *Crawford* v. *Washington,* 541 U. S. 36, 53–54. These cases require the Court to determine which police "interrogations" produce statements that fall within this prohibition. Without attempting to produce an exhaustive classification of all conceivable statements as either testimonial or nontestimonial, it suffices to decide the present cases to hold that statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution. Pp. 6–7.

2. McCottry's statements identifying Davis as her assailant were not testimonial. Pp. 8–14.

(a) This case requires the Court to decide whether the Confrontation Clause applies only to testimonial hearsay, and, if so, whether the 911 recording qualifies. *Crawford* suggested the answer to the first question, noting that "the Confrontation Clause . . . applies to 'witnesses' against the accused—in other words, those who 'bear testimony.'" Only "testimonial statements" cause a declarant to be a witness. The Court is unaware of any early American case invoking the Confrontation Clause or the common-law right to confrontation that did not involve testimony as thus defined. Well into the 20th century, this Court's jurisprudence was carefully applied only in the testimonial context, and its later cases never in practice dispensed with the Confrontation Clause requirements of unavailability and prior cross-examination in cases involving testimonial hearsay. Pp. 8–11.

(b) The question in *Davis*, therefore, is whether, objectively considered, the interrogation during the 911 call produced testimonial statements. In contrast to *Crawford*, where the interrogation took place at a police station and was directed solely at establishing a past crime, a 911 call is ordinarily designed primarily to describe current circumstances requiring police assistance. The difference is apparent here. McCottry was speaking of events as they were actually happening, while Crawford's interrogation took place hours after the events occurred. Moreover, McCottry was facing an ongoing emergency. Further, the statements elicited were necessary to enable the police to resolve the present emergency rather than simply to learn what had happened in the past. Finally, the difference in the level of formality is striking. Crawford calmly answered questions at a station house, with an officer-interrogator taping and taking notes,

while McCottry's frantic answers were provided over the phone, in an environment that was not tranquil, or even safe. Thus, the circumstances of her interrogation objectively indicate that its primary purpose was to enable police assistance to meet an ongoing emergency. She was not acting as a witness or testifying. Pp. 11–14.

3. Amy Hammon's statements were testimonial. They were not much different from those in *Crawford*. It is clear from the circumstances that Amy's interrogation was part of an investigation into possibly criminal past conduct. There was no emergency in progress, she told the police when they arrived that things were fine, and the officer questioning her was seeking to determine not what was happening but what had happened. Objectively viewed, the primary, if not sole, purpose of the interrogation was to investigate a possible crime. While the formal features of Crawford's interrogation strengthened her statements' testimonial aspect, such features were not essential to the point. In both cases, the declarants were separated from the defendants, the statements recounted how potentially criminal past events began and progressed, and the interrogation took place some time after the events were over. For the same reasons the comparison to *Crawford* is compelling, the comparison to *Davis* is unpersuasive. The statements in *Davis* were taken when McCottry was alone, unprotected by police, and apparently in immediate danger from Davis. She was seeking aid, not telling a story about the past. Pp. 14–17.

4. The Indiana courts may determine on remand whether a claim of forfeiture by wrongdoing—under which one who obtains a witness's absence by wrongdoing forfeits the constitutional right to confrontation—is properly raised in *Hammon,* and, if so, whether it is meritorious. Absent such a finding, the Sixth Amendment operates to exclude Amy Hammon's affidavit. Pp. 18–19.

No. 05–5224, 154 Wash. 2d 291, 111 P. 3d 844, affirmed; No. 05–5705, 829 N. E. 2d 444, reversed and remanded.

SCALIA, J., delivered the opinion of the Court, in which ROBERTS, C. J., and STEVENS, KENNEDY, SOUTER, GINSBURG, BREYER, and ALITO, JJ., joined. THOMAS, J., filed an opinion concurring in the judgment in part and dissenting in part.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

Nos. 05–5224 and 05–5705

ADRIAN MARTELL DAVIS, PETITIONER

05–5224          *v.*

WASHINGTON

ON WRIT OF CERTIORARI TO THE SUPREME COURT OF
WASHINGTON

HERSHEL HAMMON, PETITIONER

05–5705          *v.*

INDIANA

ON WRIT OF CERTIORARI TO THE SUPREME COURT OF
INDIANA

[June 19, 2006]

JUSTICE SCALIA delivered the opinion of the Court.

These cases require us to determine when statements made to law enforcement personnel during a 911 call or at a crime scene are "testimonial" and thus subject to the requirements of the Sixth Amendment's Confrontation Clause.

## I

### A

The relevant statements in *Davis* v. *Washington*, No. 05–5224, were made to a 911 emergency operator on February 1, 2001. When the operator answered the initial call, the connection terminated before anyone spoke. She

reversed the call, and Michelle McCottry answered.  In the ensuing conversation, the operator ascertained that McCottry was involved in a domestic disturbance with her former boyfriend Adrian Davis, the petitioner in this case:

> "911 Operator:  Hello.
> "Complainant:  Hello.
> "911 Operator:  What's going on?
> "Complainant:  He's here jumpin' on me again.
> "911 Operator:  Okay.  Listen to me carefully.  Are you in a house or an apartment?
> "Complainant:  I'm in a house.
> "911 Operator:  Are there any weapons?
> "Complainant:  No.  He's usin' his fists.
> "911 Operator:  Okay.  Has he been drinking?
> "Complainant:   No.
> "911 Operator:  Okay, sweetie.  I've got help started.  Stay on the line with me, okay?
> "Complainant:  I'm on the line.
> "911 Operator: Listen to me carefully.  Do you know his last name?
> "Complainant:  It's Davis.
> "911 Operator:  Davis?  Okay, what's his first name?
> "Complainant:  Adran
> "911 Operator:  What is it?
> "Complainant:  Adrian.
> "911 Operator:  Adrian?
> "Complainant:  Yeah.
> "911 Operator:  Okay.  What's his middle initial?
> "Complainant:  Martell.  He's runnin' now."  App. in No. 05–5224, pp. 8–9.

As the conversation continued, the operator learned that Davis had "just r[un] out the door" after hitting McCottry, and that he was leaving in a car with someone else.  *Id.*, at 9–10.  McCottry started talking, but the operator cut her off, saying, "Stop talking and answer my questions."  *Id.*,

at 10. She then gathered more information about Davis (including his birthday), and learned that Davis had told McCottry that his purpose in coming to the house was "to get his stuff," since McCottry was moving. *Id.*, at 11–12. McCottry described the context of the assault, *id.*, at 12, after which the operator told her that the police were on their way. "They're gonna check the area for him first," the operator said, "and then they're gonna come talk to you." *Id.*, at 12–13.

The police arrived within four minutes of the 911 call and observed McCottry's shaken state, the "fresh injuries on her forearm and her face," and her "frantic efforts to gather her belongings and her children so that they could leave the residence." 154 Wash. 2d 291, 296, 111 P. 3d 844, 847 (2005) (en banc).

The State charged Davis with felony violation of a domestic no-contact order. "The State's only witnesses were the two police officers who responded to the 911 call. Both officers testified that McCottry exhibited injuries that appeared to be recent, but neither officer could testify as to the cause of the injuries." *Ibid.* McCottry presumably could have testified as to whether Davis was her assailant, but she did not appear. Over Davis's objection, based on the Confrontation Clause of the Sixth Amendment, the trial court admitted the recording of her exchange with the 911 operator, and the jury convicted him. The Washington Court of Appeals affirmed, 116 Wash. App. 81, 64 P. 3d 661 (2003). The Supreme Court of Washington, with one dissenting justice, also affirmed, concluding that the portion of the 911 conversation in which McCottry identified Davis was not testimonial, and that if other portions of the conversation were testimonial, admitting them was harmless beyond a reasonable doubt. 154 Wash. 2d, at 305, 111 P. 3d, at 851. We granted certiorari. 546 U. S. \_\_\_ (2005).

B

In *Hammon* v. *Indiana*, No. 05–5705, police responded late on the night of February 26, 2003, to a "reported domestic disturbance" at the home of Hershel and Amy Hammon. 829 N. E. 2d 444, 446 (Ind. 2005). They found Amy alone on the front porch, appearing "'somewhat frightened,'" but she told them that "'nothing was the matter,'" *id.*, at 446, 447. She gave them permission to enter the house, where an officer saw "a gas heating unit in the corner of the living room" that had "flames coming out of the . . . partial glass front. There were pieces of glass on the ground in front of it and there was flame emitting from the front of the heating unit." App. in No. 05–5705, p. 16.

Hershel, meanwhile, was in the kitchen. He told the police "that he and his wife had 'been in an argument' but 'everything was fine now' and the argument 'never became physical.'" 829 N. E. 2d, at 447. By this point Amy had come back inside. One of the officers remained with Hershel; the other went to the living room to talk with Amy, and "again asked [her] what had occurred." *Ibid.;* App. in No. 05–5705, at 17, 32. Hershel made several attempts to participate in Amy's conversation with the police, see *id.*, at 32, but was rebuffed. The officer later testified that Hershel "became angry when I insisted that [he] stay separated from Mrs. Hammon so that we can investigate what had happened." *Id.*, at 34. After hearing Amy's account, the officer "had her fill out and sign a battery affidavit." *Id.*, at 18. Amy handwrote the following: "Broke our Furnace & shoved me down on the floor into the broken glass. Hit me in the chest and threw me down. Broke our lamps & phone. Tore up my van where I couldn't leave the house. Attacked my daughter." *Id.*, at 2.

The State charged Hershel with domestic battery and with violating his probation. Amy was subpoenaed, but

she did not appear at his subsequent bench trial. The State called the officer who had questioned Amy, and asked him to recount what Amy told him and to authenticate the affidavit. Hershel's counsel repeatedly objected to the admission of this evidence. See *id.*, at 11, 12, 13, 17, 19, 20, 21. At one point, after hearing the prosecutor defend the affidavit because it was made "under oath," defense counsel said, "That doesn't give us the opportunity to cross examine [the] person who allegedly drafted it. Makes me mad." *Id.*, at 19. Nonetheless, the trial court admitted the affidavit as a "present sense impression," *id.*, at 20, and Amy's statements as "excited utterances" that "are expressly permitted in these kinds of cases even if the declarant is not available to testify." *Id.*, at 40. The officer thus testified that Amy

> "informed me that she and Hershel had been in an argument. That he became irrate [sic] over the fact of their daughter going to a boyfriend's house. The argument became . . . physical after being verbal and she informed me that Mr. Hammon, during the verbal part of the argument was breaking things in the living room and I believe she stated he broke the phone, broke the lamp, broke the front of the heater. When it became physical he threw her down into the glass of the heater.
>
> .        .        .        .        .
>
> "She informed me Mr. Hammon had pushed her onto the ground, had shoved her head into the broken glass of the heater and that he had punched her in the chest twice I believe." *Id.,* at 17–18.

The trial judge found Hershel guilty on both charges, *id.,* at 40, and the Indiana Court of Appeals affirmed in relevant part, 809 N. E. 2d 945 (2004). The Indiana Supreme Court also affirmed, concluding that Amy's statement was admissible for state-law purposes as an excited utterance,

829 N. E. 2d, at 449; that "a 'testimonial' statement is one given or taken in significant part for purposes of preserving it for potential future use in legal proceedings," where "the motivations of the questioner and declarant are the central concerns," *id.*, at 456, 457; and that Amy's oral statement was not "testimonial" under these standards, *id.*, at 458. It also concluded that, although the affidavit was testimonial and thus wrongly admitted, it was harmless beyond a reasonable doubt, largely because the trial was to the bench. *Id.*, at 458–459. We granted certiorari. 546 U. S. ___ (2005).

## II

The Confrontation Clause of the Sixth Amendment provides: "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." In *Crawford* v. *Washington,* 541 U. S. 36, 53–54 (2004), we held that this provision bars "admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." A critical portion of this holding, and the portion central to resolution of the two cases now before us, is the phrase "testimonial statements." Only statements of this sort cause the declarant to be a "witness" within the meaning of the Confrontation Clause. See *id.*, at 51. It is the testimonial character of the statement that separates it from other hearsay that, while subject to traditional limitations upon hearsay evidence, is not subject to the Confrontation Clause.

Our opinion in *Crawford* set forth "[v]arious formulations" of the core class of "'testimonial'" statements, *ibid.*, but found it unnecessary to endorse any of them, because "some statements qualify under any definition," *id.,* at 52. Among those, we said, were "[s]tatements taken by police officers in the course of interrogations," *ibid.;* see also *id.*,

at 53. The questioning that generated the deponent's statement in *Crawford*—which was made and recorded while she was in police custody, after having been given *Miranda* warnings as a possible suspect herself— "qualifies under any conceivable definition" of an "'interrogation,'" 541 U. S., at 53, n. 4. We therefore did not define that term, except to say that "[w]e use [it] . . . in its colloquial, rather than any technical legal, sense," and that "one can imagine various definitions . . . , and we need not select among them in this case." *Ibid.* The character of the statements in the present cases is not as clear, and these cases require us to determine more precisely which police interrogations produce testimony.

Without attempting to produce an exhaustive classification of all conceivable statements—or even all conceivable statements in response to police interrogation—as either testimonial or nontestimonial, it suffices to decide the present cases to hold as follows: Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.[1]

———————

[1] Our holding refers to interrogations because, as explained below, the statements in the cases presently before us are the products of interrogations—which in some circumstances tend to generate testimonial responses. This is not to imply, however, that statements made in the absence of any interrogation are necessarily nontestimonial. The Framers were no more willing to exempt from cross-examination volunteered testimony or answers to open-ended questions than they were to exempt answers to detailed interrogation. (Part of the evidence against Sir Walter Raleigh was a letter from Lord Cobham that was plainly *not* the result of sustained questioning. *Raleigh's Case*, 2 How. St. Tr. 1, 27 (1603).) And of course even when interrogation exists, it is

### III

### A

In *Crawford*, it sufficed for resolution of the case before us to determine that "even if the Sixth Amendment is not solely concerned with testimonial hearsay, that is its primary object, and interrogations by law enforcement officers fall squarely within that class." *Id.,* at 53. Moreover, as we have just described, the facts of that case spared us the need to define what we meant by "interrogations." The *Davis* case today does not permit us this luxury of indecision. The inquiries of a police operator in the course of a 911 call[2] are an interrogation in one sense, but not in a sense that "qualifies under any conceivable definition." We must decide, therefore, whether the Confrontation Clause applies only to testimonial hearsay; and, if so, whether the recording of a 911 call qualifies.

The answer to the first question was suggested in *Crawford,* even if not explicitly held:

> "The text of the Confrontation Clause reflects this focus [on testimonial hearsay]. It applies to 'witnesses' against the accused—in other words, those who 'bear testimony.' 1 N. Webster, An American Dictionary of the English Language (1828). 'Testimony,' in turn, is typically 'a solemn declaration or affirmation made for the purpose of establishing or proving some fact.' *Ibid.* An accuser who makes a formal

_____

in the final analysis the declarant's statements, not the interrogator's questions, that the Confrontation Clause requires us to evaluate.

[2] If 911 operators are not themselves law enforcement officers, they may at least be agents of law enforcement when they conduct interrogations of 911 callers. For purposes of this opinion (and without deciding the point), we consider their acts to be acts of the police. As in *Crawford* v. *Washington*, 541 U. S. 36 (2004), therefore, our holding today makes it unnecessary to consider whether and when statements made to someone other than law enforcement personnel are "testimonial."

statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not." 541 U. S., at 51.

A limitation so clearly reflected in the text of the constitutional provision must fairly be said to mark out not merely its "core," but its perimeter.

We are not aware of any early American case invoking the Confrontation Clause or the common-law right to confrontation that did not clearly involve testimony as thus defined.[3] Well into the 20th century, our own Confrontation Clause jurisprudence was carefully applied only in the testimonial context. See, *e.g.*, *Reynolds* v. *United States,* 98 U. S. 145, 158 (1879) (testimony at prior trial was subject to the Confrontation Clause, but petitioner had forfeited that right by procuring witness's absence); *Mattox*

———————

[3] See, *e.g.*, *State* v. *Webb*, 2 N. C. 103, 103–104 (Super. L. & Eq. 1794) *(per curiam)* (excluding deposition taken in absence of the accused); *State* v. *Atkins*, 1 Tenn. 229 (Super. L. & Eq. 1807) *(per curiam)* (excluding prior testimony of deceased witness); *Johnston* v. *State*, 10 Tenn. 58, 59 (Err. & App. 1821) (admitting written deposition of deceased deponent, because defendant had the opportunity to cross-examine); *Finn* v. *Commonwealth*, 26 Va. 701, 707–708 (1827) (excluding prior testimony of a witness still alive, though outside the jurisdiction); *State* v. *Hill*, 20 S. C. L. 607 (App. 1835) (excluding deposition of deceased victim taken in absence of the accused); *Commonwealth* v. *Richards*, 35 Mass. 434, 436–439 (1837) (excluding preliminary examination testimony of deceased witness because the witness's precise words were not available); *Bostick* v. *State*, 22 Tenn. 344 (1842) (admitting deposition of deceased where defendant declined opportunity to cross-examine); *People* v. *Newman*, 5 Hill 295 (N. Y. Sup. Ct. 1843) *(per curiam)* (excluding prior trial testimony of witness who was still alive); *State* v. *Campbell*, 30 S. C. L. 124, 125 (App. L. 1844) (excluding deposition taken in absence of the accused); *State* v. *Valentine*, 29 N. C. 225 (1847) *(per curiam)* (admitting preliminary examination testimony of decedent where defendant had opportunity to cross-examine); *Kendrick* v. *State*, 29 Tenn. 479, 491 (1850) (admitting testimony of deceased witness at defendant's prior trial); *State* v. *Houser*, 26 Mo. 431, 439–441 (1858) (excluding deposition of deponent who was still alive).

v. *United States,* 156 U. S. 237, 240–244 (1895) (prior trial testimony of deceased witnesses admitted because subject to cross-examination); *Kirby* v. *United States,* 174 U. S. 47, 55–56 (1899) (guilty pleas and jury conviction of others could not be admitted to show that property defendant received from them was stolen); *Motes* v. *United States,* 178 U. S. 458, 467, 470–471 (1900) (written deposition subject to cross-examination was not admissible because witness was available); *Dowdell* v. *United States,* 221 U. S. 325, 330–331 (1911) (facts regarding conduct of prior trial certified to by the judge, the clerk of court, and the official reporter did not relate to defendants' guilt or innocence and hence were not statements of "witnesses" under the Confrontation Clause).

Even our later cases, conforming to the reasoning of *Ohio* v. *Roberts,* 448 U. S. 56 (1980),[4] never in practice dispensed with the Confrontation Clause requirements of unavailability and prior cross-examination in cases that involved testimonial hearsay, see *Crawford*, 541 U. S., at 57–59 (citing cases), with one arguable exception, see *id.*, at 58, n. 8 (discussing *White* v. *Illinois,* 502 U. S. 346 (1992)). Where our cases did dispense with those requirements—even under the *Roberts* approach—the statements at issue were clearly nontestimonial. See, *e.g.*, *Bourjaily* v. *United States,* 483 U. S. 171, 181–184 (1987) (statements made unwittingly to a Government informant); *Dutton* v. *Evans,* 400 U. S. 74, 87–89 (1970) (plurality opinion) (statements from one prisoner to another).

Most of the American cases applying the Confrontation Clause or its state constitutional or common-law counterparts involved testimonial statements of the most formal

—————

[4] "*Roberts* condition[ed] the admissibility of all hearsay evidence on whether it falls under a 'firmly rooted hearsay exception' or bears 'particularized guarantees of trustworthiness.'" *Crawford*, 541 U. S., at 60 (quoting *Roberts*, 448 U. S., at 66). We overruled *Roberts* in *Crawford* by restoring the unavailability and cross-examination requirements.

sort—sworn testimony in prior judicial proceedings or formal depositions under oath—which invites the argument that the scope of the Clause is limited to that very formal category. But the English cases that were the progenitors of the Confrontation Clause did not limit the exclusionary rule to prior court testimony and formal depositions, see *Crawford*, *supra,* at 52, and n. 3. In any event, we do not think it conceivable that the protections of the Confrontation Clause can readily be evaded by having a note-taking policeman *recite* the unsworn hearsay testimony of the declarant, instead of having the declarant sign a deposition. Indeed, if there is one point for which no case—English or early American, state or federal—can be cited, that is it.

The question before us in *Davis*, then, is whether, objectively considered, the interrogation that took place in the course of the 911 call produced testimonial statements. When we said in *Crawford*, *supra*, at 53, that "interrogations by law enforcement officers fall squarely within [the] class" of testimonial hearsay, we had immediately in mind (for that was the case before us) interrogations solely directed at establishing the facts of a past crime, in order to identify (or provide evidence to convict) the perpetrator. The product of such interrogation, whether reduced to a writing signed by the declarant or embedded in the memory (and perhaps notes) of the interrogating officer, is testimonial. It is, in the terms of the 1828 American dictionary quoted in *Crawford,* "'[a] solemn declaration or affirmation made for the purpose of establishing or proving some fact.'" 541 U. S., at 51. (The solemnity of even an oral declaration of relevant past fact to an investigating officer is well enough established by the severe consequences that can attend a deliberate falsehood. See, *e.g., United States* v. *Stewart*, 433 F. 3d 273, 288 (CA2 2006) (false statements made to federal investigators violate 18 U. S. C. §1001); *State* v. *Reed*, 2005 WI 53, ¶30, 695 N. W.

2d 315, 323 (state criminal offense to "knowingly giv[e] false information to [an] officer with [the] intent to mislead the officer in the performance of his or her duty").) A 911 call, on the other hand, and at least the initial interrogation conducted in connection with a 911 call, is ordinarily not designed primarily to "establis[h] or prov[e]" some past fact, but to describe current circumstances requiring police assistance.

The difference between the interrogation in *Davis* and the one in *Crawford* is apparent on the face of things. In *Davis,* McCottry was speaking about events *as they were actually happening*, rather than "describ[ing] past events," *Lilly* v. *Virginia,* 527 U. S. 116, 137 (1999) (plurality opinion). Sylvia Crawford's interrogation, on the other hand, took place hours after the events she described had occurred. Moreover, any reasonable listener would recognize that McCottry (unlike Sylvia Crawford) was facing an ongoing emergency. Although one *might* call 911 to provide a narrative report of a crime absent any imminent danger, McCottry's call was plainly a call for help against bona fide physical threat. Third, the nature of what was asked and answered in *Davis*, again viewed objectively, was such that the elicited statements were necessary to be able to *resolve* the present emergency, rather than simply to learn (as in *Crawford*) what had happened in the past. That is true even of the operator's effort to establish the identity of the assailant, so that the dispatched officers might know whether they would be encountering a violent felon. See, *e.g.*, *Hiibel* v. *Sixth Judicial Dist. Court of Nev., Humboldt Cty.,* 542 U. S. 177, 186 (2004). And finally, the difference in the level of formality between the two interviews is striking. Crawford was responding calmly, at the station house, to a series of questions, with the officer-interrogator taping and making notes of her answers; McCottry's frantic answers were provided over the phone, in an environment that was not tranquil, or

even (as far as any reasonable 911 operator could make out) safe.

We conclude from all this that the circumstances of McCottry's interrogation objectively indicate its primary purpose was to enable police assistance to meet an ongoing emergency. She simply was not acting as a *witness;* she was not *testifying.* What she said was not "a weaker substitute for live testimony" at trial, *United States* v. *Inadi,* 475 U. S. 387, 394 (1986), like Lord Cobham's statements in *Raleigh's Case,* 2 How. St. Tr. 1 (1603), or Jane Dingler's *ex parte* statements against her husband in *King* v. *Dingler,* 2 Leach 561, 168 Eng. Rep. 383 (1791), or Sylvia Crawford's statement in *Crawford.* In each of those cases, the *ex parte* actors and the evidentiary products of the *ex parte* communication aligned perfectly with their courtroom analogues. McCottry's emergency statement does not. No "witness" goes into court to proclaim an emergency and seek help.

Davis seeks to cast McCottry in the unlikely role of a witness by pointing to English cases. None of them involves statements made during an ongoing emergency. In *King* v. *Brasier,* 1 Leach 199, 168 Eng. Rep. 202 (1779), for example, a young rape victim, "immediately on her coming home, told all the circumstances of the injury" to her mother. *Id.,* at 200, 168 Eng. Rep., at 202. The case would be helpful to Davis if the relevant statement had been the girl's screams for aid as she was being chased by her assailant. But by the time the victim got home, her story was an account of past events.

This is not to say that a conversation which begins as an interrogation to determine the need for emergency assistance cannot, as the Indiana Supreme Court put it, "evolve into testimonial statements," 829 N. E. 2d, at 457, once that purpose has been achieved. In this case, for example, after the operator gained the information needed to address the exigency of the moment, the emergency appears

to have ended (when Davis drove away from the premises). The operator then told McCottry to be quiet, and proceeded to pose a battery of questions. It could readily be maintained that, from that point on, McCottry's statements were testimonial, not unlike the "structured police questioning" that occurred in *Crawford*, 541 U. S., at 53, n. 4. This presents no great problem. Just as, for Fifth Amendment purposes, "police officers can and will distinguish almost instinctively between questions necessary to secure their own safety or the safety of the public and questions designed solely to elicit testimonial evidence from a suspect," *New York* v. *Quarles,* 467 U. S. 649, 658–659 (1984), trial courts will recognize the point at which, for Sixth Amendment purposes, statements in response to interrogations become testimonial. Through *in limine* procedure, they should redact or exclude the portions of any statement that have become testimonial, as they do, for example, with unduly prejudicial portions of otherwise admissible evidence. Davis's jury did not hear the *complete* 911 call, although it may well have heard some testimonial portions. We were asked to classify only McCottry's early statements identifying Davis as her assailant, and we agree with the Washington Supreme Court that they were not testimonial. That court also concluded that, even if later parts of the call were testimonial, their admission was harmless beyond a reasonable doubt. Davis does not challenge that holding, and we therefore assume it to be correct.

## B

Determining the testimonial or nontestimonial character of the statements that were the product of the interrogation in *Hammon* is a much easier task, since they were not much different from the statements we found to be testimonial in *Crawford*. It is entirely clear from the circumstances that the interrogation was part of an inves-

tigation into possibly criminal past conduct—as, indeed, the testifying officer expressly acknowledged, App. in No. 05–5705, at 25, 32, 34. There was no emergency in progress; the interrogating officer testified that he had heard no arguments or crashing and saw no one throw or break anything, *id.*, at 25. When the officers first arrived, Amy told them that things were fine, *id.*, at 14, and there was no immediate threat to her person. When the officer questioned Amy for the second time, and elicited the challenged statements, he was not seeking to determine (as in *Davis*) "what is happening," but rather "what happened." Objectively viewed, the primary, if not indeed the sole, purpose of the interrogation was to investigate a possible crime—which is, of course, precisely what the officer *should* have done.

It is true that the *Crawford* interrogation was more formal. It followed a *Miranda* warning, was tape-recorded, and took place at the station house, see 541 U. S., at 53, n. 4. While these features certainly strengthened the statements' testimonial aspect—made it more objectively apparent, that is, that the purpose of the exercise was to nail down the truth about past criminal events—none was essential to the point. It was formal enough that Amy's interrogation was conducted in a separate room, away from her husband (who tried to intervene), with the officer receiving her replies for use in his "investigat[ion]." App. in No. 05–5705, at 34. What we called the "striking resemblance" of the *Crawford* statement to civil-law *ex parte* examinations, 541 U. S., at 52, is shared by Amy's statement here. Both declarants were actively separated from the defendant—officers forcibly prevented Hershel from participating in the interrogation. Both statements deliberately recounted, in response to police questioning, how potentially criminal past events began and progressed. And both took place some time after the events described were over. Such statements

under official interrogation are an obvious substitute for live testimony, because they do precisely *what a witness does* on direct examination; they are inherently testimonial.[5]

Both Indiana and the United States as *amicus curiae*

_____

[5] The dissent criticizes our test for being "neither workable nor a targeted attempt to reach the abuses forbidden by the [Confrontation] Clause," *post*, at 9 (opinion of THOMAS, J.). As to the former: We have acknowledged that our holding is not an "exhaustive classification of all conceivable statements—or even all conceivable statements in response to police interrogation," *supra*, at 7, but rather a resolution of the cases before us and those like them. For *those* cases, the test is objective and quite "workable." The dissent, in attempting to formulate an exhaustive classification of its own, has not provided anything that deserves the description "workable"—unless one thinks that the distinction between "formal" and "informal" statements, see *post,* at 4–5, qualifies. And the dissent even qualifies that vague distinction by acknowledging that the Confrontation Clause "also reaches the use of technically informal statements when used to evade the formalized process," *post*, at 5, and cautioning that the Clause would stop the State from "us[ing] out-of-court statements as a means of circumventing the literal right of confrontation," *post*, at 6. It is hard to see this as much more "predictable," *ibid.*, than the rule we adopt for the narrow situations we address. (Indeed, under the dissent's approach it is eminently arguable that the dissent should agree, rather than disagree, with our disposition in *Hammon* v. *Indiana*, No. 05–5705.)

As for the charge that our holding is not a "targeted attempt to reach the abuses forbidden by the [Confrontation] Clause," which the dissent describes as the depositions taken by Marian magistrates, characterized by a high degree of formality, see *post,* at 2–3: We do not dispute that formality is indeed essential to testimonial utterance. But we no longer have examining Marian magistrates; and we do have, as our 18th-century forebears did not, examining police officers, see L. Friedman, Crime and Punishment in American History 67–68 (1993)—who perform investigative and testimonial functions once performed by examining Marian magistrates, see J. Langbein, The Origins of Adversary Criminal Trial 41 (2003). It imports sufficient formality, in our view, that lies to such officers are criminal offenses. Restricting the Confrontation Clause to the precise forms against which it was originally directed is a recipe for its extinction. Cf. *Kyllo* v. *United States,* 533 U. S. 27 (2001).

argue that this case should be resolved much like *Davis*. For the reasons we find the comparison to *Crawford* compelling, we find the comparison to *Davis* unpersuasive. The statements in *Davis* were taken when McCottry was alone, not only unprotected by police (as Amy Hammon was protected), but apparently in immediate danger from Davis. She was seeking aid, not telling a story about the past. McCottry's present-tense statements showed immediacy; Amy's narrative of past events was delivered at some remove in time from the danger she described. And after Amy answered the officer's questions, he had her execute an affidavit, in order, he testified, "[t]o establish events that have occurred previously." App. in No. 05–5705, at 18.

Although we necessarily reject the Indiana Supreme Court's implication that virtually any "initial inquiries" at the crime scene will not be testimonial, see 829 N. E. 2d, at 453, 457, we do not hold the opposite—that *no* questions at the scene will yield nontestimonial answers. We have already observed of domestic disputes that "[o]fficers called to investigate . . . need to know whom they are dealing with in order to assess the situation, the threat to their own safety, and possible danger to the potential victim." *Hiibel*, 542 U. S., at 186. Such exigencies may *often* mean that "initial inquiries" produce nontestimonial statements. But in cases like this one, where Amy's statements were neither a cry for help nor the provision of information enabling officers immediately to end a threatening situation, the fact that they were given at an alleged crime scene and were "initial inquiries" is immaterial. Cf. *Crawford, supra*, at 52, n. 3.[6]

––––––––––

[6] Police investigations themselves are, of course, in no way impugned by our characterization of their fruits as testimonial. Investigations of past crimes prevent future harms and lead to necessary arrests. While prosecutors may hope that inculpatory "nontestimonial" evidence is gathered, this is essentially beyond police control. Their saying that an

IV

Respondents in both cases, joined by a number of their *amici*, contend that the nature of the offenses charged in these two cases—domestic violence—requires greater flexibility in the use of testimonial evidence. This particular type of crime is notoriously susceptible to intimidation or coercion of the victim to ensure that she does not testify at trial. When this occurs, the Confrontation Clause gives the criminal a windfall. We may not, however, vitiate constitutional guarantees when they have the effect of allowing the guilty to go free. Cf. *Kyllo* v. *United States,* 533 U. S. 27 (2001) (suppressing evidence from an illegal search). But when defendants seek to undermine the judicial process by procuring or coercing silence from witnesses and victims, the Sixth Amendment does not require courts to acquiesce. While defendants have no duty to assist the State in proving their guilt, they *do* have the duty to refrain from acting in ways that destroy the integrity of the criminal-trial system. We reiterate what we said in *Crawford:* that "the rule of forfeiture by wrongdoing . . . extinguishes confrontation claims on essentially equitable grounds." 541 U. S., at 62 (citing *Reynolds,* 98 U. S., at 158–159). That is, one who obtains the absence of a witness by wrongdoing forfeits the constitutional right to confrontation.

We take no position on the standards necessary to demonstrate such forfeiture, but federal courts using Federal Rule of Evidence 804(b)(6), which codifies the forfeiture doctrine, have generally held the Government to the preponderance-of-the-evidence standard, see, *e.g.*, *United*

_____

emergency exists cannot make it be so. The Confrontation Clause in no way governs police conduct, because it is the trial *use* of, not the investigatory *collection* of, *ex parte* testimonial statements which offends that provision. But neither can police conduct govern the Confrontation Clause; testimonial statements are what they are.

*States* v. *Scott*, 284 F. 3d 758, 762 (CA7 2002). State courts tend to follow the same practice, see, *e.g.*, *Commonwealth* v. *Edwards*, 444 Mass. 526, 542, 830 N. E. 2d 158, 172 (2005). Moreover, if a hearing on forfeiture is required, *Edwards*, for instance, observed that "hearsay evidence, including the unavailable witness's out-of-court statements, may be considered." *Id.*, at 545, 830 N. E. 2d, at 174. The *Roberts* approach to the Confrontation Clause undoubtedly made recourse to this doctrine less necessary, because prosecutors could show the "reliability" of *ex parte* statements more easily than they could show the defendant's procurement of the witness's absence. *Crawford*, in overruling *Roberts*, did not destroy the ability of courts to protect the integrity of their proceedings.

We have determined that, absent a finding of forfeiture by wrongdoing, the Sixth Amendment operates to exclude Amy Hammon's affidavit. The Indiana courts may (if they are asked) determine on remand whether such a claim of forfeiture is properly raised and, if so, whether it is meritorious.

\*    \*    \*

We affirm the judgment of the Supreme Court of Washington in No. 05–5224. We reverse the judgment of the Supreme Court of Indiana in No. 05–5705, and remand the case to that Court for proceedings not inconsistent with this opinion.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

————

Nos. 05–5224 and 05–5705

————

ADRIAN MARTELL DAVIS, PETITIONER
05–5224            *v.*
WASHINGTON

ON WRIT OF CERTIORARI TO THE SUPREME COURT OF
WASHINGTON

HERSHEL HAMMON, PETITIONER
05–5705            *v.*
INDIANA

ON WRIT OF CERTIORARI TO THE SUPREME COURT OF
INDIANA

[June 19, 2006]

JUSTICE THOMAS, concurring in the judgment in part and dissenting in part.

In *Crawford* v. *Washington*, 541 U. S. 36 (2004), we abandoned the general reliability inquiry we had long employed to judge the admissibility of hearsay evidence under the Confrontation Clause, describing that inquiry as "*inherently*, and therefore *permanently*, unpredictable." *Id.,* at 68, n. 10 (emphasis in original). Today, a mere two years after the Court decided *Crawford*, it adopts an equally unpredictable test, under which district courts are charged with divining the "primary purpose" of police interrogations. *Ante*, at 7. Besides being difficult for courts to apply, this test characterizes as "testimonial," and therefore inadmissible, evidence that bears little resemblance to what we have recognized as the evidence targeted by the Confrontation Clause. Because neither of the cases before the Court today would implicate the

Confrontation Clause under an appropriately targeted standard, I concur only in the judgment in *Davis* v. *Washington*, No. 05–5224, and dissent from the Court's resolution of *Hammon* v. *Indiana*, No. 05–5705.

## I

### A

The Confrontation Clause provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him . . . ."  U. S. Const., Amdt. 6.  We have recognized that the operative phrase in the Clause, "witnesses against him," could be interpreted narrowly, to reach only those witnesses who actually testify at trial, or more broadly, to reach many or all of those whose out-of-court statements are offered at trial.  *Crawford, supra*, at 42–43; *White* v. *Illinois*, 502 U. S. 346, 359–363 (1992) (THOMAS, J., concurring in part and concurring in judgment).  Because the narrowest interpretation of the Clause would conflict with both the history giving rise to the adoption of the Clause and this Court's precedent, we have rejected such a reading.  See *Crawford, supra*, at 50–51; *White, supra*, at 360 (opinion of THOMAS, J.).

Rejection of the narrowest view of the Clause does not, however, require the broadest application of the Clause to exclude otherwise admissible hearsay evidence.  The history surrounding the right to confrontation supports the conclusion that it was developed to target particular practices that occurred under the English bail and committal statutes passed during the reign of Queen Mary, namely, the "civil-law mode of criminal procedure, and particularly its use of *ex parte* examinations as evidence against the accused."  *Crawford, supra*, at 43, 50; *White, supra*, at 361–362 (opinion of THOMAS, J.); *Mattox* v. *United States*, 156 U. S. 237, 242 (1895).  "The predominant purpose of the [Marian committal] statute was to

institute *systematic* questioning of the accused and the witnesses." J. Langbein, Prosecuting Crime in the Renaissance 23 (1974) (emphasis added). The statute required an oral examination of the suspect and the accusers, transcription within two days of the examinations, and physical transmission to the judges hearing the case. *Id.*, at 10, 23. These examinations came to be used as evidence in some cases, in lieu of a personal appearance by the witness. *Crawford*, *supra*, at 43–44; 9 W. Holdsworth, A History of English Law 223–229 (1926). Many statements that would be inadmissible as a matter of hearsay law bear little resemblance to these evidentiary practices, which the Framers proposed the Confrontation Clause to prevent. See, *e.g., Crawford*, *supra*, at 51 (contrasting "[a]n off-hand, overheard remark" with the abuses targeted by the Confrontation Clause). Accordingly, it is unlikely that the Framers intended the word "witness" to be read so broadly as to include such statements. Cf. *Dutton* v. *Evans*, 400 U. S. 74, 94 (1970) (Harlan, J., concurring in result) (rejecting the "assumption that the core purpose of the Confrontation Clause of the Sixth Amendment is to prevent overly broad exceptions to the hearsay rule").

In *Crawford*, we recognized that this history could be squared with the language of the Clause, giving rise to a workable, and more accurate, interpretation of the Clause. "'[W]itnesses,'" we said, are those who "'bear testimony.'" 541 U. S., at 51 (quoting 1 N. Webster, An American Dictionary of the English Language (1828)). And "'[t]estimony'" is "'[a] solemn declaration or affirmation made for the purpose of establishing or proving some fact.'" *Ibid.* (quoting Webster, *supra*). Admittedly, we did not set forth a detailed framework for addressing whether a statement is "testimonial" and thus subject to the Confrontation Clause. But the plain terms of the "testimony" definition we endorsed necessarily require some degree of solemnity

before a statement can be deemed "testimonial."

This requirement of solemnity supports my view that the statements regulated by the Confrontation Clause must include "extrajudicial statements . . . contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions." *White*, *supra*, at 365 (opinion of THOMAS, J.). Affidavits, depositions, and prior testimony are, by their very nature, taken through a formalized process. Likewise, confessions, when extracted by police in a formal manner, carry sufficient indicia of solemnity to constitute formalized statements and, accordingly, bear a "striking resemblance," *Crawford*, *supra*, at 52, to the examinations of the accused and accusers under the Marian statutes.[1] See generally Langbein, *supra*, at 21–34.

Although the Court concedes that the early American cases invoking the right to confrontation or the Confrontation Clause itself all "clearly involve[d] testimony" as defined in *Crawford*, *ante*, at 9, it fails to acknowledge that all of the cases it cites fall within the narrower category of formalized testimonial materials I have proposed. See *ante*, at 9, n. 3.[2] Interactions between the police and

--------

[1] Like the Court, I presume the acts of the 911 operator to be the acts of the police. *Ante*, at 8, n. 2. Accordingly, I refer to both the operator in *Davis* and the officer in *Hammon*, and their counterparts in similar cases, collectively as "the police."

[2] Our more recent cases, too, nearly all hold excludable under the Confrontation Clause materials that are plainly highly formal. See *White* v. *Illinois*, 502 U. S. 346, 365, n. 2 (1992) (THOMAS, J., concurring in part and concurring in judgment). The only exceptions involve confessions of codefendants to police, and those confessions appear to have either been formal due to their occurrence in custody or to have been formalized into signed documents. See *Douglas* v. *Alabama*, 380 U. S. 415, 416 (1965) (signed confession); *Brookhart* v. *Janis*, 384 U. S. 1 (1966) (signed confession taken after accomplice's arrest, see Brief for Petitioner in *Brookhart* v. *Janis*, O. T. 1965, No. 657, pp. 10–11); *Bruton* v. *United States*, 391 U. S. 123, 124 (1968) (custodial interrogation); *Roberts* v. *Russell*, 392 U. S. 293 (1968) *(per curiam)* (custodial

an accused (or witnesses) resemble Marian proceedings—and these early cases—only when the interactions are somehow rendered "formal." In *Crawford*, for example, the interrogation was custodial, taken after warnings given pursuant to *Miranda* v. *Arizona*, 384 U. S. 436 (1966). 541 U. S., at 38. *Miranda* warnings, by their terms, inform a prospective defendant that "'anything he says can be used against him in a court of law.'" *Dickerson* v. *United States*, 530 U. S. 428, 435 (2000) (quoting *Miranda*, *supra*, at 479). This imports a solemnity to the process that is not present in a mere conversation between a witness or suspect and a police officer.[3]

The Court all but concedes that no case can be cited for its conclusion that the Confrontation Clause also applies to informal police questioning under certain circumstances. *Ante*, at 9–11. Instead, the sole basis for the Court's conclusion is its apprehension that the Confrontation Clause will "readily be evaded" if it is only applicable to formalized testimonial materials. *Ante*, at 11. But the Court's proposed solution to the risk of evasion is needlessly overinclusive. Because the Confrontation Clause sought to regulate prosecutorial abuse occurring through use of *ex parte* statements as evidence against the accused, it also reaches the use of technically informal statements when used to evade the formalized process. Cf. *ibid.* That is, even if the interrogation itself is not formal, the production of evidence by the prosecution at trial would resemble the abuses targeted by the Confrontation Clause if the

_____

interrogation following a warning that the co-defendant's statement could be used against her at trial, see Brief in Opposition, O. T. 1967, No. 920, pp. 5–6).

[3] The possibility that an oral declaration of past fact to a police officer, if false, could result in legal consequences to the speaker, see *ante*, at 11–12, may render honesty in casual conversations with police officers important. It does not, however, render those conversations solemn or formal in the ordinary meanings of those terms.

prosecution attempted to use out-of-court statements as a means of circumventing the literal right of confrontation, see *Coy* v. *Iowa*, 487 U. S. 1012 (1988). In such a case, the Confrontation Clause could fairly be applied to exclude the hearsay statements offered by the prosecution, preventing evasion without simultaneously excluding evidence offered by the prosecution in good faith.

The Court's standard is not only disconnected from history and unnecessary to prevent abuse; it also yields no predictable results to police officers and prosecutors attempting to comply with the law. Cf. *Crawford*, *supra*, at 68, n. 10 (criticizing unpredictability of the pre-*Crawford* test); *White*, 502 U. S., at 364–365 (THOMAS, J., concurring in part and concurring in judgment) (limiting the Confrontation Clause to the discrete category of materials historically abused would "greatly simplify" application of the Clause). In many, if not most, cases where police respond to a report of a crime, whether pursuant to a 911 call from the victim or otherwise, the purposes of an interrogation, viewed from the perspective of the police, are *both* to respond to the emergency situation *and* to gather evidence. See *New York* v. *Quarles*, 467 U. S. 649, 656 (1984) ("Undoubtedly most police officers [deciding whether to give *Miranda* warnings in a possible emergency situation] would act out of a host of different, instinctive, and largely unverifiable motives—their own safety, the safety of others, and perhaps as well the desire to obtain incriminating evidence from the suspect"). Assigning one of these two "largely unverifiable motives," *ibid.*, primacy requires constructing a hierarchy of purpose that will rarely be present—and is not reliably discernible. It will inevitably be, quite simply, an exercise in fiction.

The Court's repeated invocation of the word "objectiv[e]" to describe its test, see *ante*, at 7, 11–13, 15, however, suggests that the Court may not mean to reference purpose at all, but instead to inquire into the function

served by the interrogation. Certainly such a test would avoid the pitfalls that have led us repeatedly to reject tests dependent on the subjective intentions of police officers.[4] It would do so, however, at the cost of being even more disconnected from the prosecutorial abuses targeted by the Confrontation Clause. Additionally, it would shift the ability to control whether a violation occurred from the police and prosecutor to the judge, whose determination as to the "primary purpose" of a particular interrogation would be unpredictable and not necessarily tethered to the actual purpose for which the police performed the interrogation.

## B

Neither the 911 call at issue in *Davis* nor the police questioning at issue in *Hammon* is testimonial under the appropriate framework. Neither the call nor the questioning is itself a formalized dialogue.[5] Nor do any circumstances surrounding the taking of the statements render those statements sufficiently formal to resemble the Marian examinations; the statements were neither Mirandized nor custodial, nor accompanied by any similar indicia of formality. Finally, there is no suggestion that the prosecution attempted to offer the women's hearsay

---

[4] See *New York* v. *Quarles*, 467 U. S. 649, 655–656, and n. 6 (1984) (subjective motivation of officer not relevant in considering whether the public safety exception to *Miranda* v. *Arizona*, 384 U. S. 436 (1966), is applicable); *Rhode Island* v. *Innis*, 446 U. S. 291, 301 (1980) (subjective intent of police officer to obtain incriminatory statement not relevant to whether an interrogation has occurred); *Whren* v. *United States*, 517 U. S. 806, 813 (1996) (refusing to evaluate Fourth Amendment reasonableness in light of the officers' actual motivations).

[5] Although the police questioning in *Hammon* was ultimately reduced to an affidavit, all agree that the affidavit is inadmissible *per se* under our definition of the term "testimonial." Brief for Respondent in No. 05–5705, p. 46; Brief for United States as *Amicus Curiae* in No. 05–5705, p. 14.

evidence at trial in order to evade confrontation. See 829 N. E. 2d 444, 447 (Ind. 2005) (prosecution subpoenaed Amy Hammon to testify, but she was not present); 154 Wash. 2d 291, 296, 111 P. 3d 844, 847 (2005) (en banc) (State was unable to locate Michelle McCottry at the time of trial). Accordingly, the statements at issue in both cases are nontestimonial and admissible under the Confrontation Clause.

The Court's determination that the evidence against Hammon must be excluded extends the Confrontation Clause far beyond the abuses it was intended to prevent. When combined with the Court's holding that the evidence against Davis is perfectly admissible, however, the Court's *Hammon* holding also reveals the difficulty of applying the Court's requirement that courts investigate the "primary purpose[s]" of the investigation. The Court draws a line between the two cases based on its explanation that *Hammon* involves "no emergency in progress," but instead, mere questioning as "part of an investigation into possibly criminal past conduct," *ante*, at 14–15, and its explanation that *Davis* involves questioning for the "primary purpose" of "enabl[ing] police assistance to meet an ongoing emergency," *ante*, at 13. But the fact that the officer in *Hammon* was investigating Mr. Hammon's past conduct does not foreclose the possibility that the primary purpose of his inquiry was to assess whether Mr. Hammon constituted a continuing danger to his wife, requiring further police presence or action. It is hardly remarkable that Hammon did not act abusively towards his wife in the presence of the officers, *ante*, at 15, and his good judgment to refrain from criminal behavior in the presence of police sheds little, if any, light on whether his violence would have resumed had the police left without further questioning, transforming what the Court dismisses as "past con-

duct" back into an "ongoing emergency." *Ante*, at 13, 15.[6]
Nor does the mere fact that McCottry needed emergency
aid shed light on whether the "primary purpose" of gather-
ing, for example, the name of her assailant was to protect
the police, to protect the victim, or to gather information
for prosecution. In both of the cases before the Court, like
many similar cases, pronouncement of the "primary"
motive behind the interrogation calls for nothing more
than a guess by courts.

## II

Because the standard adopted by the Court today is
neither workable nor a targeted attempt to reach the
abuses forbidden by the Clause, I concur only in the judg-
ment in *Davis* v. *Washington*, No. 05–5224, and respect-
fully dissent from the Court's resolution of *Hammon* v.
*Indiana*, No. 05–5705.

───────────

[6] Some of the factors on which the Court relies to determine that the
police questioning in *Hammon* was testimonial apply equally in *Davis*.
For example, while Hammon was "actively separated from the [victim]"
and thereby "prevented . . . from participating in the interrogation,"
Davis was apart from McCottry while she was questioned by the 911
operator and thus unable to participate in the questioning. *Ante,* at 2,
15. Similarly, "the events described [by McCottry] were over" by the
time she recounted them to the 911 operator. *Ibid.* See 154 Wash. 2d
291, 295–296, 111 P. 3d 844, 846–847 (2005) (en banc).