IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 31275-5-III |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | UNPUBLISHED OPINION |
| | ) | |
| CESAR SAUL PRADO, | ) | |
| | ) | |
| Appellant. | ) | |

LAWRENCE-BERREY, J. — Cesar Prado appeals his convictions for attempted first and second degree murder and his exceptional sentence based on a gang aggravator. He contends insufficient evidence supports the attempted murder convictions and the criminal street gang sentencing enhancement. He also contends: (1) the trial court erred in admitting the expert gang testimony under ER 404(b) and ER 702, (2) the gang enhancements must be reversed because the gang experts' testimony was based on testimonial hearsay, in violation of his Sixth Amendment right to confrontation (3) the State engaged in prosecutorial misconduct, (4) the trial court erred in giving a missing witness instruction and a lesser included instruction, and (5) he received ineffective assistance of counsel. We disagree with Mr. Prado's contentions and affirm.

FACTS

Late in the evening on October 18, 2010, Angela Deckard and Brandon Parren, a Sureno gang member, were at a Conoco gas station at 301 North First Street in Yakima, Washington. Ms. Deckard pumped gas while Mr. Parren went into the store. Ms. Deckard noticed three people drive by in a grey car and give her "dirty looks," but she did not recognize them and was not particularly concerned. Report of Proceedings (RP) at 530. As Mr. Parren returned to the car, he was shot in the neck and leg and fell to the ground. Ms. Deckard, who was inside the car, heard the gunshots. As she attempted to exit the car, she was shot in the leg and shoulder. Neither Mr. Parren nor Ms. Deckard could identify the shooter. Officer Eric Walls responded to the call of the shooting and spoke with several witnesses. One witness told him that he had seen a person run from the east side of the building to a car that was at a gas pump, saw the person start shooting, and then run eastward.

Police identified Israel Rivera, a Norteno gang member who was known to drive a grey Kia, as a suspect. Several hours after the shooting, police were informed that a grey Kia had crashed into a barrier and that two Hispanic males were seen running from the car. Police went to Mr. Rivera's house and learned that he had been seen with Cesar Prado earlier in the evening. Police subsequently arrested Mr. Rivera and Mr. Prado.

2

Mr. Prado, who was 15 years old at the time of the shootings, was originally

charged in juvenile court with two counts of first degree assault. After a declination

hearing, the juvenile court declined jurisdiction and the State charged him with two

counts of attempted first degree murder and one count of first degree unlawful possession

of a firearm.

*Pretrial Motions*

Before trial, Mr. Prado moved to exclude any reference to gangs or gang activity,

arguing there was no nexus between his gang affiliation and the charged offenses. The

State, in turn, moved for admission of expert gang testimony, contending the evidence

was relevant "to establish motive for an otherwise seemingly senseless act of violence."

Clerk's Papers (CP) at 23.

As an offer of proof, the State argued the gang evidence provided the res gestae of

the case and showed intent, motive, preparation, and lack of mistake under ER 404(b).

The State noted that one of the victims, Mr. Parren, has a prominent Sureno tattoo on his

face, and that Mr. Prado was aware that Mr. Parren was a rival gang member. The State

argued, "[t]he whole motivation of this is they have some history of familiarity with each

other and had wanted to assault Mr. Parren on an earlier occasion but didn't. They took

the opportunity when he was on the north side over here, which is considered territory of

3

La Raza, north side gangs, Norteno, and he was in the wrong place." RP at 27. Without

that background, the State argued, "this is just a nonsensical random crime with no

purpose and no motive." RP at 27.

Mr. Prado responded that the prejudice of the gang information outweighed any

probative value and cautioned the court that it was going to be difficult to "seat an

impartial jury given the gang activity in this community." RP at 28.

The trial court granted the motion to admit the gang evidence and denied the

motion to exclude, finding the evidence prejudicial, but that "ample" evidence established

that "gang association was the reason for this alleged crime." RP at 29. It explained: "I

think it is relevant. I think a person who is known as a gang expert should be entitled to

testify and explain to the jury how the gang works and what motivates them." RP at 40.

The court continued, "[I]t has been my experience that gangs are understood and known

to the general public but not necessarily how they work or operate. I think that will be

important, an explanation, so the jurors can understand." RP at 41.

*Trial Testimony*

At trial, Mr. Rivera testified that he and Mr. Prado were childhood friends and that

they spent time together every day. The prosecutor asked Mr. Rivera why he testified

against Mr. Prado. Mr. Rivera responded, "Because I don't want to get in trouble. I don't

4

want to go down for it. I don't want to go to prison for the rest of my life." RP at 448.

Mr. Rivera stated that he and Mr. Prado were members of La Raza, a subset of the Norteno gang. He explained that he and Mr. Prado were "soldiers" for La Raza who "put in work" to earn stripes for the gang. RP at 415. The prosecutor questioned Mr. Rivera about how gang members achieve status in the gang:

> [Prosecutor]: And what type of crimes give La Raza gang members higher status?
> [Mr. Rivera]: Shootings.
> [Prosecutor]: Is that the highest status?
> [Mr. Rivera]: Yeah.
> [Prosecutor]: Does it matter whether you kill somebody or not?
> [Mr. Rivera]: Not really.
> [Prosecutor]: It's just the willingness to shoot somebody?
> [Mr. Rivera]: Yes.
> [Prosecutor]: Do you get a higher status if you actually kill somebody?
> [Mr. Rivera]: Yes.
> [Prosecutor]: Who are your typical targets?
> [Mr. Rivera]: S[u]renos.

RP at 416.

Mr. Rivera also explained that the older gang members direct the work, and "[o]nce you put in work, then you're respected." RP at 417. According to Mr. Rivera, some La Raza members routinely carried firearms, including Mr. Prado.

Mr. Rivera then described the night of the shootings. According to Mr. Rivera, the north side of Yakima is Norteno territory, and this area encompasses the Conoco station

5

where the shootings occurred. Mr. Rivera stated that on the day in question, he picked up Mr. Prado just before noon. Mr. Prado was wearing a black and white checkered shirt and carrying a semi-automatic gun. They drove around for a while and went to a local park where they picked up Patrick Bentley, a mutual friend. The three of them then cruised around with the intent to do some car prowling. Mr. Rivera pulled into the Conoco gas station where he saw Mr. Parren, a known rival gang member. Mr. Rivera told Mr. Bentley and Mr. Prado that he had just seen Mr. Parren, which prompted Mr. Prado to ask if he should "light him up." RP at 435. The prosecutor asked:

> [Prosecutor]: What did [Mr. Prado] mean by light someone up?
> [Mr. Rivera]: Shoot them.
> [Prosecutor]: Were you surprised when he said that?
> [Mr. Rivera]: No.
> [Prosecutor]: Why?
> [Mr. Rivera]: Because those kind of things are expected.

RP at 436.

Mr. Rivera then drove a short distance from the gas station. According to Mr. Rivera, Mr. Prado put a bandana over his face, "[c]ocked [the gun] back, put one in the chamber," and walked back to the Conoco station. RP at 438. Mr. Rivera heard a series of shots, saw Mr. Prado run back to the car, and heard him state he had just shot "the scrap" and a girl. RP at 439. Mr. Rivera told Mr. Prado that he had "earned some stripes" for the gang. RP at 440.

Neither Ms. Deckard nor Mr. Parren were able to identify the shooter. Ms. Deckard stated that she was unable to get a good look at who was shooting. Mr. Parren described the shooter as stocky and about 5' 6." He saw someone wearing a bandana point an object at him, but could not identify the person. Mr. Parren admitted that he was a Sureno, and that even if he could have identified the shooter, he would not have done so because it would have ended his career.

Ms. Deckard and Mr. Parren described their injuries. Ms. Deckard testified that she was shot in the leg and shoulder. She stated that one bullet entered just below her knee, exited, and then went back into her thigh and stopped in her hip. Mr. Parren testified that when he saw the shooter point the object at him, he turned his head away at the last minute to avoid being shot directly in the head. He testified that he was shot in the neck and upper leg and was wheelchair bound for an extended period of time because one bullet had shattered his femur.

William Wilson, MD, testified about the dangers of bullets entering the neck or femoral artery areas. He explained that the neck is an extremely worrisome area because it can involve an injury to the upper spine, which can cause quadriplegia or paralyze the nerves that go to the diaphragm, and can be lethal in a short amount of time. He also testified that an injury to the airway is immediately life threatening and can result in

7

imminent death.

The State introduced several witnesses to explain gang culture. Detective Joe Salinas, who has worked for the Yakima police department for 22 years and headed the department's gang unit for five of those years, testified that officers in the gang unit receive constant ongoing training, and that he has daily contact with gang members on the street.

Detective Salinas testified that he was one of the first officers to respond to the shooting. When he arrived at the scene, he saw Mr. Parren lying next to a car parked by a gas pump. He recognized Mr. Parren from his experience on the gang unit. Mr. Parren had a gunshot wound near his head and on the side of his torso. Detective Salinas observed 11 shell casing in the parking lot.

Detective Salinas testified that Mr. Parren had "what [he] would classify as a gang tattoo, which is an X under the right eye and a 3 under the left eye." RP at 155. He explained, "[t]he X3 is significant in that it stands for the number 13, which is [Mr. Parren's] affiliation with S[u]reno gangs." RP at 155. Detective Salinas also testified that the area around the gas station was a predominantly Norteno neighborhood, "so much so that we could just about determine if there was a carload of individuals wearing blue in that neighborhood that we were going to have some problems." RP at 158.

Detective Salinas further explained that La Raza is a subset of the Norteno gang and that it "is probably the more active or most active gang . . . in Yakima." RP at 158. He testified that tattoos and certain types of clothing are gang identifiers, and explained that Surenos wear the color blue as a gang identifier, while the Nortenos wear red. He also stated, "This is a gang on gang, red on blue shooting. That's a gang-motivated crime." RP at 158.

According to the detective, gang members are taught not to be forthright with police: "It's taught early on that you don't talk to police, that in gang culture you're not going to talk to police because there's no snitching. . . . Nobody talks to the cops." RP at 172-73. Detective Salinas also testified that gang members "put in work" for the gang to either increase their stature within the gang or to promote the gang. RP at 167. He explained this work included daytime burglaries to obtain items of property desired by a gang leader, such as a television or lawnmower. According to the detective, gang members gain the highest level of respect by committing more serious crimes: "[I]f you spill blood for that gang, you automatically get status. . . . You may have gone and done a hit on a rival, which is viewed as important in the gang world. . . . So once you do those significant things, spill blood for the gang, shoot a rival, spend time in prison, those are viewed as very big for the gang." RP at 170.

9

The prosecutor asked Detective Salinas to detail his experience with La Raza:

> [Prosecutor]: How many incidents, since you've been on the [police department], have you been involved with? Let's say property crimes involving La Raza gang members and let's say violent crimes.
>
> [Detective Salinas]: There's too many to mention. Not the violent— not so many of the violent crimes as it is the property crimes. Property crimes are a big nuisance for the city. . . . Burglaries are big. Car prowls are big. Assaults on rivals are big.
>
> What you really can't stop is the chance encounters. We talked about Mr. Parren. You have it on your face. You're telling the world who you are. You're wearing the clothing.
>
> You go to the Walmart, there's no telling who you're going to see there. You could see a Norteno. You're riding your bike in the neighborhood. You may wind up in the wrong neighborhood. Somebody's going to put you in check. Somebody is going to be there to let you know this is not your neighborhood. You don't belong here. We came across that quite a bit.

RP at 170-71.

Detective Salinas then explained the structure of gangs, noting that their structure was changing due to the increased incarceration of gang members:

> We picked them up on probation violations, any number of things, to control the head, put enough of them away.
>
> Now you have no structure, no leadership. What's happened now is the older gang members . . . have been removed, put in prison for varying types of crimes. Now you have no leadership or structure. You've got a bunch of underlings with no direction.
>
> Little homey will go on the street or try to freelance, go out and sell dope by himself somewhere. He's making his own money.

RP at 179. The prosecutor asked whether "a gang member can act both personally and

10

for the larger gang when they're committing crime?" RP at 179. Detective Salinas

answered:

> An individual before, you would have an individual getting direction on
> exactly what to do. Now that's not there anymore. So an individual
> thinking he can get some status may go out and act on his own without any
> direction from the hierarchy. Then you have issues, crossing boundar[y]
> lines, all kinds of things, that maybe the membership didn't want to happen.
> Maybe they've got family members living in rival territory. All [of] the
> sudden they get shot up with gang fire because of something the little
> homeys did. You have things going on where there is no direction, people
> acting out on their own.

RP at 179-80.

Efren Morfin, a gang enforcement police officer for three years, testified that in

addition to basic law enforcement training, he attended annual specialized gang trainings.

He explained, "[w]e go over gangs, the history of gangs, where they evolved. A bunch of

deputies get together and share information, intelligence." RP at 302. He also stated that

he has daily contact with gang members and that over the last few years has had contact

with hundreds of gang members.

The prosecutor asked Officer Morfin to explain the "anti-snitch ethic." RP at 315.

Officer Morfin answered:

> [Officer Morfin]: In gang language, snitching is telling on
> somebody. You don't want to snitch because there is certain rules that you
> live by as a gang member. So if you snitch, you're telling on your homey
> that just went out and did some stuff, usually involving crimes or anything

11

that can pin them up against a serious crime or any type of crime. So basically, don't talk to the police, don't cooperate, don't share information with them. That's essentially what that means.

[Prosecutor]: What if the person is a victim of a crime? Is it okay to come in and cooperate with the police investigation and testify[?]

[Officer Morfin]: No. Usually if they're a victim, the idea behind it is, again, no snitching and take care of the issue later. If you can't handle your issue as a gang member, you're looked upon as weak.

RP at 315-16. However, Officer Morfin also noted that gang members will snitch "[t]o get themselves out of trouble if they participated in something" and know they are more likely to take the hit. RP at 316.

Chris Taylor testified that he has worked for the Yakima Police Department for seven years with close to five of those years in the gang unit. Regarding his gang expertise, he stated that he is a member of the Northwest Gang Investigators Association, has participated in approximately 120 extra hours of specialized gang-related training, and has attended monthly and quarterly gang intelligence briefings throughout the state.

Officer Taylor testified that Mr. Parren is a self-admitted member of the East Side Surenos, a subset of the larger Sureno gang. He stated:

Mr. Parren had a lot of clout. He's what you would call an original gangster, an OG. He had been incarcerated for at least five years before he got released, and he was involved in gangs before that, before he went away. So he had quite a tenure with gangs, which gave him the clout or the seniority, you would say.

RP at 330.

12

Upon being asked whether a rival gang member would earn more respect killing an older gang member, Officer Taylor responded:

Yes. The original gangsters or OG's, they're smarter. They have been around longer. They're aware of what goes on, knowing what to look for. If you're an up and coming rival and you're able to take out a senior level of a rival gang member, it's all going to give you more credibility. . . . If a young rival gang member takes out a senior rival gang member, he gets a feather in his cap.

RP at 330.

Officer Taylor testified that Mr. Parren would be considered a rival of La Raza and opined that La Raza is considered a criminal street gang. He stated that La Raza has been involved in "violent homicides, homicides, drive-by shooting, robberies. They've been known to be very active in home invasion or daytime burglaries, drug dealings, weapons dealings[,] promoting prostitution, running girls, witness tampering. Basically they run the gambit as long as it prospers them or the gang directly." RP at 352-53.

Officer Taylor also stated that Mr. Prado would benefit both himself and La Raza by shooting Mr. Parren and Ms. Deckard, explaining:

It would tell rival S[u]reno gang members—typically in Yakima First Street is the border. If you're west of you're primarily S[u]reno. By doing something that's right on the border, that's Norteno or La Raza, whatever Norteno set is telling the S[u]renos that even if you come close to the border we will shoot you. We don't need a reason or the justification. If you come into our territory we will shoot you.

    That instills fear. It also, by instilling fear in rival gang members, it

13

keeps them safe basically that nobody is going to come there and shoot them. They have the strike first mentality.

RP at 353.

The prosecutor then questioned Officer Taylor about snitching:

[Prosecutor]: How does the anti-snitch ethic play into that?

[Officer Taylor]: Gang members are very anti-telling, anti-snitching. . . . If you're the victim of a crime you don't talk to the police. If you're the victim of a crime and you help the police identify who the shooter was or who assaulted you, your own gang will check you or discipline you. They will beat you up for helping law enforcement out for prosecuting your crime.

[Prosecutor]: What's the expectation of how those things should be handled?

[Officer Taylor]: You remain quiet, either mislead the police by describing someone else or saying you weren't assaulted.

. . . .

[Prosecutor]: In a serious case, how is snitching looked at?

[Officer Taylor]: In a case where you're putting someone away for a long time, by actually going in open court and saying that's the guy that pulled the trigger or that's the guy that drove in the drive-by, you go with a green light. It's a go ahead any time that gang sees you there to assault you, stab you, shoot you, do whatever they can to kill you or hurt you.

RP at 354-56. According to Officer Taylor, per Sureno rules, Mr. Parren's role as a Sureno was simply to say "I was shot. I don't know who did it. I didn't see anything." RP at 357.

Officer Taylor also explained the role of women in gangs. He testified that women "are going to be in the car holding the drugs, probably holding firearms" because many

14

gang members are not allowed to have guns due to their criminal history. RP at 358.

Officer Taylor also stated that women provide alibis, stating, women are "engrained in the

gang culture. If they don't provide that alibi or support their boyfriend or the gang, they

can also can be put in check." RP at 359.

After the State rested, Mr. Prado moved for a directed verdict, arguing that the

State failed to prove intent or premeditation. He also pointed out that other than the

discredited testimony of Mr. Rivera, no witnesses identified Mr. Prado as the shooter.

The court denied the motion, reasoning as follows:

> The testimony of Mr. Rivera, the title or describing it as discredited is a
> conclusion, I think, that the defense would want to achieve. That is a
> decision that the jury would engage in.
>     The testimony from him was clear that he identified, targeted and
> had gone to Mr. Prado, informed him of that. Mr. Prado stated what he was
> going to do. He got out of the car. He put a bandana on with the intent of
> achieving a particular purpose.
>     He traveled some distance to get to the target. He fired 11 shots, two
> initially and then the remaining in quick succession. The gap between the
> two and the remaining would suggest that there was some passage of time
> when there was an ability deliberate. Following that period of time the
> remaining bullets were fired, and two people were hit.

RP at 548-49.

Mr. Prado took the stand in his defense. He did not dispute that he was a member

of La Raza, but denied shooting Mr. Parren or Ms. Deckard. He testified that on the

afternoon of October 18, 2010, Mr. Rivera picked him up to drive around. According to

15

Mr. Prado, he and Mr. Rivera stopped at an apartment complex and visited with friends until 8:00 or 9:00 at night. Mr. Prado claimed that after visiting with these friends, Mr. Rivera drove him to Isabel Torres's house, where Mr. Prado stayed until midnight. Mr. Rivera's stepfather then picked him up from Ms. Torres's house and dropped him off at his house between 12:30 a.m. and 1:00 a.m. Mr. Prado testified that he originally admitted to an officer that he was at the Conoco station that night. However, Mr. Prado testified that he really had not been to the Conoco station that night, but had originally lied so that they'd "stop asking me questions." RP at 575.

The prosecution played portions of two telephone calls made by Mr. Prado from jail to Mr. Rivera. In those calls, Mr. Prado called Mr. Rivera a snitch. He never called Mr. Rivera a liar.

The jury found Mr. Prado not guilty of attempted first degree murder in count 1, but found him guilty of the lesser included offense of attempted second degree murder. It also returned guilty verdicts for the attempted first degree murder charge in count 2 and first degree unlawful possession of a firearm in count 3. The jury returned firearms enhancements in counts 1 and 2, and a special verdict finding Mr. Prado committed counts 2 and 3 with the intent to benefit a criminal street gang. The court imposed an exceptional sentence of 590 months based on the firearm enhancements and the gang

16

aggravator.

## ANALYSIS

### I. *Sufficiency of the Evidence*

A. *Attempted First and Second Degree Murder*. Mr. Prado first argues that the State presented insufficient evidence to convict him of attempted first and second degree murder and assigns error to the trial court's denial of his motion for a directed verdict on the two counts. At trial, Mr. Prado argued that the State failed to prove premeditation or that he was the shooter. On appeal, he contends the evidence is insufficient because the murder convictions were supported almost exclusively by Mr. Rivera's unreliable snitch testimony, and there was no physical or forensic evidence linking him to the crime. He also points out that no witnesses, apart from Mr. Rivera, identified Mr. Prado as the shooter, including the victims.

Evidence is sufficient to support a conviction if, viewed in the light most favorable to the jury's verdict, it permits any rational trier of fact to find the essential elements of the crime beyond a reasonable doubt. *State v. Salinas*, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992). A claim of insufficiency admits the truth of the evidence and all reasonable inferences that a trier of fact can draw from that evidence. *Id.* Circumstantial evidence and direct evidence are equally reliable. *State v. Delmarter*, 94 Wn.2d 634, 638, 618 P.2d

17

99 (1980). We defer to the trier of fact on issues of conflicting testimony, credibility of witnesses, and the persuasiveness of the evidence. *State v. Camarillo*, 115 Wn.2d 60, 71, 794 P.2d 850 (1990).

To convict Mr. Prado of attempted first degree murder, the State had to prove beyond a reasonable doubt that he had the premeditated intent to cause the death of another person and took a substantial step toward causing the death of that person. RCW 9A.32.030(1)(a); RCW 9A.28.020(1). Premeditation is the "deliberate formation of and reflection upon the intent to take a human life." *State v. Hoffman*, 116 Wn.2d 51, 82, 804 P.2d 577 (1991). "Premeditation may be shown by circumstantial evidence where the jury's inferences are reasonable and substantial evidence supports the jury's verdict." *State v. Sherrill*, 145 Wn. App. 473, 484, 186 P.3d 1157 (2008). A conviction for attempted second degree murder requires proof of the same elements with the exception of premeditation. RCW 9A.32.050(1)(a); RCW 9A.28.020(1).

Mr. Prado's primary contention on appeal is that Mr. Rivera's testimony is unreliable due to the State's offer to substantially reduce Mr. Rivera's sentence in exchange for his testimony against Mr. Prado. He discredits Mr. Rivera's testimony, arguing, "[a]fter being offered the choice of pleading guilty to a Rendering Criminal Assistance charge and receiving a sentence of only 20 months if he would testify for the

prosecution, Mr. Rivera changed his story and implicated Mr. Prado." Br. of Appellant at 7-8.

Mr. Prado's argument goes to the weight that a trier of fact might give to the evidence, not its sufficiency. It is well settled that we do not weigh evidence or make credibility determinations, as this is left to the jury. *Camarillo*, 115 Wn.2d at 71. We also defer to the trier of fact on the persuasiveness of the evidence. *State v. Walton*, 64 Wn. App. 410, 415-16, 824 P.2d 533 (1992). As noted above, Mr. Rivera testified that he entered into an agreement with the State prior to Mr. Prado's trial. In exchange for his testimony against Mr. Prado, the State agreed to amend his charges with a significant reduction in the sentence. The jury was aware of the plea agreement and could judge Mr. Rivera's credibility in light of the deal. Moreover, the prosecutor reminded the jurors during closing argument that they were the sole judges of the credibility of the witnesses:

> When we look at the context of all of the evidence, there's one person that's been, although untruthful at the beginning, which is expected, he's a participant. We're not here trying to tell you that Israel Rivera is a saint, that he's doing this out of the goodness of his heart, quite frankly, he's not. He's doing it because he's on the Titanic, too, and it's going down, and he opted to take a life raft off.
> There's a price for it, and he described the price. He had to come and testify against his friend, Mr. Prado.

RP at 680.

The jury evaluated Mr. Rivera's testimony and presumably found it credible and persuasive.

This testimony included information that gang members gain status by shooting rival gang members, and that after being told that Mr. Parren was at the gas station, Mr. Prado offered to shoot him. Mr. Prado then tied a red bandana over his face, armed himself with a gun, and put bullets in the gun. The evidence also showed that Mr. Parren and Ms. Deckard were shot multiple times, and that Mr. Prado admitted to Mr. Rivera that he shot both of them. One of the bullets hit Mr. Parren in the neck. Another bullet hit Ms. Deckard's shoulder. Dr. Wilson testified that such injuries can be lethal. Jurors also considered Mr. Prado's inconsistent statements of whether he was at the Conoco station that night and Mr. Prado's jailhouse statements to Mr. Rivera.

As to the attempted first degree murder conviction, Mr. Prado argues there is no evidence of premeditation. The premeditation required to support a first degree murder conviction "must involve more than a moment in point of time." RCW 9A.32.020(1); *State v. Ollens*, 107 Wn.2d 848, 850, 733 P.2d 984 (1987). Thus, the State must show that the defendant decided to cause the victim's death after some period of reflection, however short. *State v. Gregory*, 158 Wn.2d 759, 817, 147 P.3d 1201 (2006) (quoting *Hoffman*, 116 Wn.2d at 82-83). Motive, gang membership, and procurement of a weapon

20

are relevant in establishing premeditation. *Sherrill*, 145 Wn. App. at 484; *State v. Boot*, 89 Wn. App. 780, 789-90, 950 P.2d 964 (1998).

The evidence establishes that Mr. Prado had a period of time to deliberate and reflect before he shot Mr. Parren. After Mr. Rivera told Mr. Prado that Mr. Parren, a rival gang member, was at the gas station, Mr. Rivera drove away and returned after Mr. Prado stated his desire to shoot Mr. Parren. This is a sufficient period of time to establish premeditation. Upon return to the Conoco gas station, Mr. Prado exited the car, walked toward Mr. Parren and Ms. Deckard and fired the contents of the revolver, returned to Mr. Rivera's car, and fled. This evidence was sufficient to establish that Mr. Prado formed the premeditated intent to kill Mr. Parren. It is also sufficient to establish that he intended, without premeditation, to kill Ms. Deckard.

B. *Aggravating Factor.* Mr. Prado next contends insufficient evidence supports the jury's finding that he committed the crimes "with intent to directly or indirectly cause any benefit, aggrandizement, gain, profit, or other advantage to or for a criminal street gang its reputation, influence, or membership" under RCW 9.94A.535(3)(aa). CP at 111. He argues the State failed to prove that (1) La Raza's primary activity is the commission of crimes, and (2) Mr. Prado committed the crimes at issue with the intent to benefit the gang. Citing *State v. Bluehorse*, 159 Wn. App. 410, 429, 248 P.3d 537 (2011), Mr. Prado

21

argues the State "merely introduced, through opinion testimony provided by police officers, conclusory statements that La Raza was involved in a variety of general crimes." Br. of Appellant at 8-9. As to the second point, Mr. Prado notes that Mr. Parren was not wearing gang colors, Ms. Deckard was not a gang member, and Mr. Prado did not say anything that would allow his gang to claim credit for the shootings.

A court may impose a sentence higher than the standard range if a jury finds the defendant committed the crimes to advance his position in a criminal street gang. RCW 9.94A.030(12). We review findings that support an exceptional sentence for substantial evidence. *State v. Moreno*, 173 Wn. App. 479, 495, 294 P.3d 812 (2013). "Criminal street gang" is defined as:

> [A]ny ongoing organization, association, or group of three or more persons, whether formal or informal, having a common name or common identifying sign or symbol, having as one of its primary activities the commission of criminal acts, and whose members or associates individually or collectively engage in or have engaged in a pattern of criminal street gang activity.

RCW 9.94A.030(12).

Relying in part on *Bluehorse*, this court has held that expert testimony about generalized gang motivations is insufficient. *Moreno*, 173 Wn. App. at 496. Rather, "[s]ome evidence must show gang involvement actually motivated the defendant to commit a crime to support RCW 9.94A.535(3)(s)'s gang aggravating factor." *Id.*

In *Bluehorse*, Crips gang members did a drive-by shooting at the house of a rival

Blood gang member named Fomai Leoso. *Bluehorse*, 159 Wn. App. at 416. At the time

of the shooting, Mr. Bluehorse was in a particular sport utility vehicle associated with his

gang and somebody yelled out a Crip-related phrase before the shooting. *Id.* at 416. For

a period of several months before the shooting, Fomai's brother, Francis Leoso, and Mr.

Bluehorse exchanged gang hand signs, particularly when Mr. Bluehorse walked in front

of the Leoso's house. *Id.* at 418. An expert testified that gang members must maintain

their status by retaliating against gang members who encroach on their territory and

disrespect their gang by making the hand signs of their own gang in rival territory. *Id.*

The Court of Appeals reversed Mr. Bluehorse's gang aggravating factor because

the exchange of gang signs several months prior was the only evidence of gang-related

motivation aside from generalized expert testimony. The court explained:

> The State presented no evidence that [Mr.] Bluehorse announced a rival
> gang status contemporaneously with the shooting or that he had recently
> confronted and been disrespected or provoked by rival gang members,
> which would . . . give rise to a contemporaneous gang requirement or desire
> to retaliate. Further, the State presented no evidence that [Mr.] Bluehorse
> made any statements that he wanted to advance his position in a gang or
> committed the drive-by shooting for reasons related to gang status.

*Id.* at 430-31 (footnote omitted).

23

Similarly in *Moreno*, the defendant committed what appeared to be a random act of violence against a nongang member. *Moreno*, 173 Wn. App. at 495. However, the court concluded that there was sufficient evidence to support the gang aggravating factor when a gang expert testified that (1) the Nortenos and Surenos are rivals, (2) there is usually a specific reason for encroaching on rival territory, and (3) gang members often commit random crimes as a way to maintain or improve their status within the gang. *Moreno*, 173 Wn. App. at 497. The court emphasized that the evidence also showed that Mr. Moreno had ties to the Nortenos, he and his cohorts were in Sureno territory, and somebody in Mr. Moreno's car yelled out a gang-related phrase moments before the shooting. *Id.* at 496-97. The court held that this evidence in connection with the expert testimony was sufficient to support the inference that Mr. Moreno intended to advance his position in his gang by shooting at the pedestrian. *Id.* at 497.

Here, like *Moreno*, there is sufficient evidence for the jury to infer that Mr. Prado intended to indirectly cause a benefit or advantage to a criminal street gang. Several gang experts testified that La Raza members engage in a wide range of criminal activity, including shootings, robberies, home invasions, drug dealings, and promoting prostitution. Detective Salinas testified that gang members "put in work" to increase their stature in the gang or to promote the gang. RP at 169. This "work" ranges from

24

committing burglaries to attacking rival gang members. The evidence also established

that Mr. Prado was a member of La Raza and that Mr. Parren was a senior member of the

Surenos, La Raza's rival gang. Officer Taylor testified that Mr. Parren as an older Sureno

member has "a lot of clout," and that a junior gang member like Mr. Prado would gain

significant respect by shooting or killing a rival senior gang member. RP at 330.

Additionally, Officer Taylor and Detective Salinas both testified that the Conoco

station was on the border between Norteno and Sureno territory. Officer Taylor

explained that both Mr. Prado and his gang would benefit from the shooting because it

would send a signal to the Surenos that "if you come close to the border we will shoot

you." RP at 353. This, in turn, he explained, would help La Raza members feel safe.

Mr. Rivera's testimony reinforced the gang experts' testimony. As detailed above,

he testified that the Conoco station is in Norteno territory and that upon being told that

Mr. Parren, a known Sureno, was in the Conoco station, Mr. Prado decided to shoot him.

In fact, Mr. Rivera stated that such an act is expected in gang culture and that he was

proud of Mr. Prado for shooting the pair. From this evidence, the jury could have

concluded that Mr. Prado committed the shootings to directly or indirectly benefit his

gang. Therefore, the sentencing court did not err in imposing an exceptional sentence

based on the gang aggravating factor.

25

II. *Admissibility of Gang-Related Evidence*

A. *ER 404(b).* Next, Mr. Prado argues the court abused its discretion in allowing gang evidence because the State failed to establish a nexus between the shootings and Mr. Prado's gang membership. To support his argument, he points to the lack of evidence that anyone in La Raza ordered the shooting of a rival gang member, noting that Detective Salinas testified that La Raza had lost its leadership and that many of its members were acting on their own. He argues that without evidence the assailant was acting for the gang as opposed to settling some personal score, the required proof of nexus fails. Mr. Prado also argues that even if a nexus between the crimes and gang membership could be established, the court erred in using ER 404(b) to admit evidence that La Raza was responsible for burglaries, drug and weapons dealings, and witness tampering. The State counters the challenged evidence was properly admitted under ER 404(b) to show motive.

We review a trial court's ER 404(b) rulings for an abuse of discretion. *State v. Guloy*, 104 Wn.2d 412, 429-30, 705 P.2d 1182 (1985); *State v. Campbell*, 78 Wn. App. 813, 821, 901 P.2d 1050 (1995). ER 404(b) provides:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of

mistake or accident.

Before a trial court may admit evidence of other crimes or misconduct, it must

(1) find by a preponderance of the evidence that the misconduct occurred, (2) determine

whether the evidence is relevant to a material issue, (3) state on the record the purpose for

which the evidence is being introduced, and (4) balance the probative value of the

evidence against the danger of unfair prejudice. *State v. Kilgore*, 147 Wn.2d 288, 292, 53

P.3d 974 (2002); *State v. Yarbrough*, 151 Wn. App. 66, 81-82, 210 P.3d 1029 (2009).

Gang evidence falls within the scope of ER 404(b). *Yarbrough*, 151 Wn. App. at

81. Because of First Amendment concerns, "evidence of criminal street gang affiliation

is not admissible in a criminal trial when it merely reflects a person's beliefs or

associations." *State v. Scott*, 151 Wn. App. 520, 526, 213 P.3d 71 (2009). "Accordingly,

to admit gang affiliation evidence there must be a nexus between the crime and gang

membership." *Id.* We have noted that courts have regularly allowed evidence of a

defendant's gang membership to establish the motive of a crime if the trial court finds a

sufficient connection between the gang affiliation and motive for committing the crime.

*Id.* at 527; *see also Boot*, 89 Wn. App. at 789.

In *Campbell*, for example, the trial court permitted evidence of gang membership

because "there was a nexus between gang culture, gang activity, gang affiliation, drugs,

and the homicides" at issue. *Campbell*, 78 Wn. App. at 818. Division Two of this court affirmed the trial court's decision to admit the evidence based on the "fact that [Mr.] Campbell was a member of a gang and a drug dealer provided the basis for the State's theory of the case. . . . The challenged evidence clearly was highly probative of the State's theory—that [Mr.] Campbell was a gang member who responded with violence to challenges to his status and to invasions of his drug sales territory." *Id.* at 821-22.

Here, in its offer of proof, the State asserted that the gang evidence was relevant to show motive and intent. It stated that it would present evidence that (1) Mr. Parren was a member of the Sureno gang, (2) gang members achieve status by shooting rival gang members, (3) Mr. Prado is a Norteno gang member and knew that Mr. Parren was a rival gang member, (4) Mr. Parren was in Norteno territory, (5) Mr. Prado prepared to shoot Mr. Parren after learning that Mr. Parren was inside the gas station.

Based on the State's offer of proof, the trial court concluded the gang affiliation evidence was prejudicial, but its relevance outweighed the prejudice because it was highly probative of Mr. Prado's motive for the crimes.

As detailed above, evidence was later offered at trial establishing the relevance of gang membership to the crime, including Mr. Prado's reported statement after shooting

Mr. Parren that he had shot "the scrap"[1] and a girl. RP at 439. Additionally, Mr. Prado and Mr. Parren were identified as rival gang members, and there was evidence that shooting a rival gang member increases a gang member's status. The evidence also established that Patrick Bentley, a La Raza member, encouraged Mr. Prado to shoot Mr. Parren, and that after the shooting, Mr. Rivera told Mr. Prado that he had earned some stripes.

This evidence was highly probative of the State's theory that this was a gang motivated crime in which Mr. Prado hoped to increase his status by shooting a rival gang member. The trial court properly balanced the gang evidence's probative value against the danger of unfair prejudice to Mr. Prado. The State demonstrated a sufficient connection between Mr. Prado's gang affiliation and the crimes charged. Accordingly, the challenged gang evidence satisfied the requirements of ER 404(b) and the trial court did not abuse its discretion in admitting the gang affiliation evidence.

In a related argument, Mr. Prado also contends the trial court erred by allowing evidence of uncharged bad acts that were irrelevant to gang affiliation or Mr. Prado's charges. Specifically, Mr. Prado points to the introduction of evidence that he had an outstanding arrest warrant for an unknown crime, that he was suspended from school, had

---

[1] Mr. Rivera testified that "scrap" is a disrespectful term for a Sureno. RP at 434.

an uncharged burglary in King County, possessed stolen handguns, and that on the day of the crime, Mr. Prado took cough syrup and an illegal prescription drug to get high. Defense counsel did not object to any of this evidence.

Under ER 404(b), evidence of other misconduct is not allowed to show that the defendant is a "criminal-type person" likely to commit the crime charged. *State v. Foxhoven*, 161 Wn.2d 168, 175, 163 P.3d 786 (2007). However, evidence of other bad acts may be allowed to complete the story of the crime on trial by proving its immediate context. *State v. Lane*, 125 Wn.2d 825, 831, 889 P.2d 929 (1995) (quoting *State v. Tharp*, 27 Wn. App. 198, 204, 616 P.2d 693 (1980), *aff'd*, 96 Wn.2d 591, 637 P.2d 961 (1981)). The rationale for this res gestae evidence is to ensure that the jury knows the whole story. *State v. Lillard*, 122 Wn. App. 422, 431-32, 93 P.3d 969 (2004).

Here, the evidence that Mr. Prado had an arrest warrant was unsolicited and therefore not sought for the improper purpose of showing that Mr. Prado was a criminal type. During cross-examination, the prosecutor asked Mr. Prado:

> Q. Isn't it true you moved from the chair in the room . . . and ran over to your bedroom real quick when the police knocked on the door?
> A. I would say, yes, I did.
> Q. Why did you do that?
> A. I had a warrant.
> Q. For what?
> A. A warrant for my arrest.
> Q. Why?

A. I'm not familiar with the charge.

. . . .

Q. Is it for residential burglary—

A. I'm not sure.

Q. —over in King County?

A. I'm not for sure. I haven't been given a copy of anything like that.

RP at 597.

The evidence that Mr. Prado took a prescription drug and was not in school on the day of the shooting, possessed a stolen gun, and participated in car prowling should have been excluded, and likely would have been, had defense counsel made a timely objection. The question of whether defense counsel's failure to object constitutes ineffective assistance of counsel will be discussed later in this opinion.

B. *ER 702.* Next, Mr. Prado contends that the trial court erred in admitting gang evidence under ER 702 because (1) the subject matter of the police officers' testimony did not require specialized knowledge, (2) the officers did not qualify as experts, and (3) their testimony improperly invaded the province of the jury when they presented opinions about the veracity of witnesses.

Admission of expert testimony under ER 702 is within the trial court's discretion. *State v. Greene,* 139 Wn.2d 64, 70, 984 P.2d 1024 (1999). A trial court abuses its discretion when it bases its decision on untenable or unreasonable grounds. *State v. Powell,* 126 Wn.2d 244, 258, 893 P.2d 615 (1995). If the reasons for admitting or

31

excluding evidence are "fairly debatable," we will not reverse the trial court's exercise of

its discretion. *State v. Simon*, 64 Wn. App. 948, 963, 831 P.2d 139 (1991) (quoting

*Walker v. Bangs*, 92 Wn.2d 854, 858, 601 P.2d 1279 (1979)), *rev'd in part on other*

*grounds by* 120 Wn.2d 196, 840 P.2d 172 (1992).

ER 702 allows qualified experts to testify regarding "scientific, technical, or other

specialized knowledge" if the testimony "will assist the trier of fact to understand the

evidence or to determine a fact in issue."[2] "Expert testimony is helpful if it concerns

matters beyond the common knowledge of the average layperson and does not mislead the

jury." *State v. Thomas*, 123 Wn. App. 771, 778, 98 P.3d 1258 (2004).

Police testimony is routinely admitted in Washington to explain gang terminology,

gang codes of conduct, and gang structure. *State v. Embry*, 171 Wn. App. 714, 729, 287

P.3d 648 (2012), *review denied*, 177 Wn.2d 1005, 300 P.3d 416 (2013); *Yarbrough*, 151

Wn. App. at 86-87; *Campbell*, 78 Wn. App. at 823. Such evidence assists the trier of fact

in understanding the State's theory of the case. *Campbell*, 78 Wn. App. at 823.

Here, the court allowed the gang expert testimony, finding it relevant to explain to

the jury how gangs operate and what motivates them.

---

[2] ER 702 states: "If scientific, technical, or other specialized knowledge will assist
the trier of fact to understand the evidence or to determine a fact in issue, a witness
qualified as an expert by knowledge, skill, experience, training, or education, may testify

Citing *United States v. Mejia*, 545 F.3d 179 (2d Cir. 2008), Mr. Prado asserts that police testimony regarding the activities of La Raza did not require specialized knowledge and was improperly introduced "under the guise of expert testimony." Br. of Appellant at 23. He specifically points to Detective Taylor's testimony about La Raza's involvement in homicides, drive-by shootings, robberies, burglaries, and drug dealing contending it "went beyond sociological interpretation of terms or symbols jurors need to understand gang issues." Br. of Appellant at 23.

*Mejia* is distinguishable. In that case, a police officer testified that the defendant's gang, MS-13, needed guns "'to do what MS 13 does, which is, you know, shoot at rival gang members, and sometimes in the process, obviously, some people get hit.'" *Mejia*, 545 F.3d at 187. The officer also testified that the MS-13 gang had committed between 18 and 23 murders in the area in recent years. *Id.* The Second Circuit held that this testimony went too far under Federal Rule of Evidence 702. *Id.* at 194-96. The court held that it was not "acceptable to substitute expert testimony for factual evidence of murder in the first instance." *Mejia*, 545 F.3d at 195. It explained:

> An increasingly thinning line separates the legitimate use of an officer expert to translate esoteric terminology or to explicate an organization's hierarchical structure from the illegitimate and impermissible substitution of expert opinion for factual evidence. . . . As the officer's purported expertise

thereto in the form of an opinion or otherwise."

narrows from "organized crime" to "this particular gang," from the meaning of "capo" to the criminality of the defendant, the officer's testimony becomes more central to the case, more corroborative of the fact witnesses, and thus more like a summary of the facts than an aide in understanding them.

*Id.* at 190.

Thus, in *Mejia*, the court distinguished the officer's impermissible propensity testimony from admissible testimony about gang mores, symbols, and internal structure. *Id.* However, unlike *Mejia*, Officer Taylor's testimony did not constitute an opinion as to Mr. Prado's guilt. He did not testify that Mr. Prado shot Mr. Parren or Ms. Deckard; rather, he testified in general terms about facts relevant to proving the criminal street gang enhancement,[3] and the workings and operations of the two gangs at issue here. Moreover, his testimony explained the motive for a crime that would otherwise appear to be a random act of attempted murder in a public area.

Mr. Prado next contends that the officers testifying as experts in his case were unqualified to present expert gang testimony. He argues that the officers failed to explain how a gang unit officer differs from any other kind of officer or the nature of their specialized training. His argument is not persuasive.

_____

[3] A gang is not a "criminal street gang" unless it has "as one of its primary activities the commission of criminal acts" and that its members "engage in or have engaged in a pattern of criminal street gang activity." RCW 9.94A.030(12).

34

Under ER 702, a court may admit expert testimony if the witness is qualified by "knowledge, skill, experience, training, or education." Formal course work in an area or academic credentials are not required to qualify as an expert; practical experience is sufficient qualification. *Simon*, 64 Wn. App. at 963 (quoting *State v. Smith*, 88 Wn.2d 639, 647, 564 P.2d 1154 (1977), *overruled on other grounds by State v. Jones*, 99 Wn.2d 735, 664 P.2d 1216 (1983)).

At trial, as detailed above, each expert described his qualifications. Officer Morfin stated that in addition to special gang training seminars, he has daily contact with gang members, and has had contact with hundreds of gang members in the last few years. Officer Taylor testified that he has worked in the gang unit for close to five years, and has participated in many hours of specialized gang related training. Similarly, Detective Salinas has worked in the gang unit for five years, receives constant ongoing training, and has daily contact with gang members on the street. The officers' work experience, training, and extensive contact with gang members sufficiently qualifies them to testify as experts. Accordingly, the trial court did not abuse its discretion in qualifying these officers as experts and allowing their testimony.

Finally, Mr. Prado contends that the expert gang witnesses improperly invaded the province of the jury by testifying about the veracity of defense witnesses and his guilt as

35

to the gang aggravator. Specifically, he points to Detective Taylor's and Officer Morfin's testimony that Mr. Parren would not identify Mr. Prado as his assailant because of the gang code. He contends, "[t]hat testimony improperly inferred that Mr. Parren could actually identify Mr. Prado as his assailant but instead would testify falsely that he could not." Br. of Appellant at 29. He also asserts that Detective Taylor's testimony that a girl's role in a gang is to provide an alibi for a gang member "improperly inferred that Ms. Torres would be testifying falsely if she were to testify that Mr. Prado was with her instead of at the scene of the shooting." Br. of Appellant at 29-30. He also contends that Detective Salinas invaded the province of the jury by testifying that that "[t]his is a gang on gang, red on blue shooting." RP at 158. Finally, Mr. Prado contends that it was improper for Officer Morfin to testify that he believed Mr. Rivera was being truthful.

"No witness, lay or expert, may testify to his opinion as to the guilt of a defendant, whether by direct statement or inference." *State v. Black*, 109 Wn.2d 336, 348, 745 P.2d 12 (1987). This prohibition exists "[b]ecause issues of credibility are reserved strictly for the trier of fact." *City of Seattle v. Heatley*, 70 Wn. App. 573, 577, 854 P.2d 658 (1993). Admission of improper opinion testimony may be constitutional error requiring reversal. *State v. Saunders*, 120 Wn. App. 800, 813, 86 P.3d 232 (2004).

Mr. Prado did not preserve this issue by objecting at trial. His failure to object bars him from claiming error. RAP 2.5(a). A timely and specific objection could have cured any potential error.

However, even if we address his argument, it fails. Detective Taylor's and Officer Morfin's statements are not opinions regarding the credibility of Mr. Parren or Ms. Torres. Both officers were explaining the anti-snitch code. Their testimony did not lead to an inference that Mr. Parren knew the identity of the shooter, it simply explained that in gang culture, a person could be injured or killed if they testified against another gang member, including a member of another gang. In any event, Mr. Parren himself testified that even if he knew the identity of the shooter he would not reveal it to officers because of the snitch code.

Similarly, Detective Taylor's testimony about the role of women in gang culture did not improperly suggest that Ms. Torres would lie if bought in to testify. It simply explained that women often serve as alibi witnesses to men in gang culture. In any event, Ms. Torres's credibility was not at issue as she was not called to testify.

Finally, we need not determine whether Officer Morfin's statement about Mr. Rivera's truthfulness amounts to improper opinion testimony. Even if error occurred, the doctrine of invited error precludes review. Invited error bars review because a party

cannot set up an error at trial and then complain on appeal. *State v. Henderson*, 114

Wn.2d 867, 870, 792 P.2d 514 (1990) (quoting *State v. Pam*, 101 Wn.2d 507, 511, 680

P.2d 762 (1984)). This prohibition applies even to constitutional issues. *State v. Boyer*,

91 Wn.2d 342, 344-45, 588 P.2d 1151 (1979). "The Court held that the invited error

doctrine was a 'strict rule' to be applied in every situation where the defendant's actions

at least in part cause the error." *State v. Summers*, 107 Wn. App. 373, 381-82, 28 P.3d

780 (2001) (citing *State v. Studd*, 137 Wn.2d 533, 547, 973 P.2d 1049 (1999)), *modified

on reconsideration on other grounds*, 43 P.3d 526 (2002).

In this case, defense counsel elicited the testimony during which Officer Morfin

stated that he believed Mr. Rivera was being truthful during his interview. If improper

opinion testimony was given, it was invited by defense counsel's question on cross-

examination and not subject to review. *See State v. Vandiver*, 21 Wn. App. 269, 273, 584

P.2d 978 (1978) (statements elicited on cross-examination were invited error precluding

appeal).

C. *Confrontation Clause Challenge to Gang Experts' Testimony.* Mr. Prado next

contends that the State's reliance on gang experts' testimony violated his Sixth

Amendment right to confrontation because the experts relied on the testimonial

statements of others. He contends, "[t]he admission of testimony from absent witnesses,

presented under the guise of expert testimony, constituted inadmissible hearsay and

violated Mr. Prado's constitutional right to confront his accuser." Br. of Appellant at 33.

He claims that "statements taken by officers in the course of investigations are almost

always testimonial and in violation of *Crawford*,[4] as are statements that are the product

of police-initiated contact." Br. of Appellant at 32.

Mr. Prado overlooks the authority that failure to raise confrontation issues at or

before trial bars any consideration on appeal. "A clear line of decisions—*Melendez-Diaz*,

*Bullcoming*, *Jasper*, and *Hayes*—requires that a defendant raise a Sixth Amendment

confrontation clause claim at or before trial or lose the benefit of the right." *State v.*

*O'Cain*, 169 Wn. App. 228, 248, 279 P.3d 926 (2012) (citing *Melendez–Diaz v.*

*Massachusetts*, 557 U.S. 305, 129 S. Ct. 2527, 174 L. Ed. 2d 314 (2009); *Bullcoming v.*

*New Mexico*, __ U.S. __, 131 S. Ct. 2705, 180 L. Ed. 2d 610 (2011); *State v. Jasper*, 174

Wn.2d 96, 271 P.3d 876 (2012); *State v. Hayes*, 165 Wn. App. 507, 265 P.3d 982 (2011),

*review denied*, 176 Wn.2d 1020 (2013)). The same rule applies to the article I, section 22

confrontation clause right of the Washington Constitution. *O'Cain*, 169 Wn. App. at 252.

Neither does he assert any manifest error theory.

---

4 *Crawford v. Washington*, 541 U.S. 36, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004).

39

Even if he had properly preserved the issue, he does not establish that the testimony at issue was testimonial. The Sixth Amendment's confrontation clause, made applicable to the states by the Fourteenth Amendment, provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. CONST. amend. VI. In *Crawford v. Washington*, the United States Supreme Court held that this provision prohibits the admission of out-of-court testimonial hearsay statements offered for their truth, unless the declarant testified at trial or was unavailable at trial and the defendant had a prior opportunity to cross-examine the witness under oath. *Crawford v. Washington*, 541 U.S. 36, 51, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004). "It is the testimonial character of the statement that separates it from other hearsay that, while subject to traditional limitations upon hearsay evidence, is not subject to the Confrontation Clause." *Davis v. Washington*, 547 U.S. 813, 821, 126 S. Ct. 2266, 165 L. Ed. 2d 224 (2006) (emphasis added).

A statement is "testimonial" if its declarant knew, or should have known, that its primary utility was to provide evidence of the defendant's unlawful conduct for use in his prosecution or a criminal investigation into past events. *Williams v. Illinois*, __ U.S. __, 132 S. Ct. 2221, 2242, 183 L. Ed. 2d 89 (2012). As the Ninth Circuit has observed, *Crawford*'s discussion of what may constitute a testimonial statement was premised on

40

the use of statements "made to a government officer with an eye toward trial, the primary abuse at which the Confrontation Clause was directed." *Jensen v. Pliler*, 439 F.3d 1086, 1089 (9th Cir. 2006). "Although *Crawford* did not define 'testimonial' or 'nontestimonial,' it made clear that the Confrontation Clause was concerned with 'testimony,' which 'is typically [a] solemn declaration or affirmation made for the purpose of establishing or proving some fact,' and noted that '[a]n accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not.'" *Delgadillo v. Woodford*, 527 F.3d 919, 927 (9th Cir. 2008) (alterations in original) (quoting *Crawford*, 541 U.S. at 51).

Mr. Prado contends the following statements violate the confrontation clause: (1) Detective Taylor's testimony that "contacts on the street" informed him that Mr. Rivera had been labeled a snitch, and (2) Detective Salinas's statement that a snitch provided information that La Raza members were involved in painting graffiti. Mr. Prado also argues that in other instances, officers provided testimony on matters that could have come only from informants or custodial interrogations from absent witnesses, including Detective Salinas's remark that gang members gain respect by injuring or shooting rival gang members.

None of the foregoing statements violate the confrontation clause because none of the out-of-court statements on which the testimony at issue was based involved accusations against Mr. Prado. Instead, the statements formed the basis of the experts' opinions about matters related to gang organization and rules. Experts can testify to their opinions on relevant matters, and relate the information and sources upon which they rely in forming those opinions. The hearsay at issue here in support of expert opinion is not the sort of testimonial hearsay the use of which *Crawford* condemns. The admission of the detectives' expert testimony based on hearsay statements does not offend the confrontation clause because the experts were subject to cross-examination about their opinions and the information on which they based their opinions was not elicited for the truth of their contents or to prove an event relevant to Mr. Prado's individual criminal prosecution.

III. *Prosecutorial Misconduct*

Mr. Prado alleges two instances of prosecutorial misconduct that he claims prejudiced his trial. He asserts that the prosecutor committed misconduct by eavesdropping on confidential conversations between Mr. Prado and his attorney and that during closing argument, he appealed to the prejudices of the jury and referenced matters outside the record.

To succeed on a claim of prosecutorial misconduct, a defendant must establish both misconduct and prejudice. *State v. Fisher*, 165 Wn.2d 727, 747, 202 P.3d 937 (2009). Prejudice exists when there is a substantial likelihood that the misconduct affected the verdict. *State v. McKenzie*, 157 Wn.2d 44, 52, 134 P.3d 221 (2006) (quoting *State v. Brown*, 132 Wn.2d 529, 561, 940 P.2d 546 (1997)). Where, as here, a defendant fails to object to the prosecutor's improper statements at trial, such failure constitutes a waiver of prosecutorial claims unless the prosecutor's statements were "so flagrant and ill intentioned" that it caused an "enduring and resulting prejudice" incurable by a jury instruction. *State v. Stenson*, 132 Wn.2d 668, 719, 940 P.2d 1239 (1997). In determining whether a prosecutor's misconduct warrants reversal, we consider its prejudicial nature and cumulative effect. *State v. Boehning*, 127 Wn. App. 511, 518, 111 P.3d 899 (2005).

Mr. Prado first claims that the prosecutor committed misconduct when he listened to Mr. Prado and his attorney discussing whether to have a potential witness served with a material witness warrant. He asserts that the prosecutor's failure to move away from the conversation or inform defense counsel that the conversation could be heard violated Mr. Prado's attorney-client privilege. Mr. Prado fails to establish either misconduct or prejudice.

43

The conversation at issue took place in the courtroom. During discussion of whether the State was entitled to a missing witness instruction regarding Isabel Torres, a potential alibi witness, the prosecutor informed the judge that he overheard Mr. Prado state in the courtroom that he did not want Ms. Torres served with a material witness warrant. The following exchange occurred:

> [Prosecutor]: My understanding, I was sitting here as was Detective Shaw when we heard Mr. Prado say that, no, he didn't want them to go out and find Ms. Torres and serve the material witness warrant on her. It would be the [S]tate's position that's [sic] the issuance of the material witness warrant was a ruse to say that she's unavailable to them. So they're not planning on calling her. It's pretty obvious.
> [Defense counsel]: I would object to that, your Honor. That's eavesdropping. I was having a confidential conversation with my client. We were going to actually try to get her over here within 12 hours time from the time that the court instructed that we were going to resume testimony. They can't use their eavesdropping on me with my confidential conversation with my client.
> [Prosecutor]: If they're saying it in open court where it can be heard, we're sitting here doing the work. I wasn't trying to listen. Do you want me to arrest her and have the warrant served? No.
> [Defense counsel]: Your Honor, I don't have a luxury of having an office. This is my office. This is my opportunity to discuss with my client. If they're going to sit here and listen to all my conversations with my client, that's improper. They can't later say we [sic] heard me talking with my client.
> THE COURT: I understand.

RP at 579-80.

The court later remarked: "You don't have anyplace to go with your client, Mr. Heilman-Schott. Mr. Clements is sitting here and does hear something. I'm not going to attribute anything bad to either the [S]tate for hearing or the defense for not asking for the issuance of a writ after the order was signed." RP at 581. The court also advised defense counsel that he could have confidential conversations with his client in the back of the courtroom, stating "[i]f you need a moment to confer with your client, we can shuffle some folks around in the courtroom and you can go to the back." RP at 583.

Contrary to Mr. Prado's assertion, the conversation he had with his attorney in an open courtroom within earshot of a third person was not privileged. The attorney-client privilege protects communications made by the client in the course of the professional relationship. RCW 5.60.060(2); *State v. Wilder*, 12 Wn. App. 296, 300, 529 P.2d 1109 (1974). However, "[i]f a statement is made in the presence of a third person . . . it is not confidential, and therefore not privileged." *Wilder*, 12 Wn. App. at 300. The prosecutor's inadvertent overhearing of the conversation between Mr. Prado and his attorney in an open courtroom in the presence of third persons cannot be deemed a violation of the attorney-client privilege. In contrast to the cases cited by Mr. Prado, the prosecutor here took no overt act to listen to the conversations. For example, in *State v. Cory*, the State eavesdropped via microphone on conversations between prisoners in the

45

jail and their attorneys. *State v. Cory*, 62 Wn.2d 371, 372, 382 P.2d 1019 (1963). The court dismissed the charges against the defendant, finding that such "eavesdropping upon the private consultations between the defendant and his attorney" deprived him of his right to effective counsel. *Id.* at 378; *see also Maine v. Moulton*, 474 U.S. 159, 160, 106 S. Ct. 477, 88 L. Ed. 2d 481 (1985) (holding the State "clearly violated respondent's Sixth Amendment right when it arranged to record conversations between respondent and its undercover informant"). Under our facts, the prosecutor did not commit misconduct by listening to a public conversation between Mr. Prado and his attorney.

The other claims of prosecutorial misconduct arise from closing argument. Mr. Prado first claims that the prosecutor improperly argued that the shootings were about Mr. Prado getting his "scrap killer tag." RP at 673. He also claims the prosecutor improperly inferred that Mr. Prado had been involved in shootings on prior occasions when he referenced the calls from Mr. Prado's family members after the shootings and stated, "it's not the first rodeo probably with them." RP at 684.

The prosecuting attorney has wide latitude in making closing argument to the jury and may draw reasonable inferences from the evidence. *Gregory*, 158 Wn.2d at 860. We review a prosecutor's remarks during closing argument in the context of the total argument, the issues in the case, the evidence addressed in the argument, and the jury

instructions. *State v. Dhaliwal*, 150 Wn.2d 559, 578, 79 P.3d 432 (2003). Appeals to the jury's "passion and prejudice" through use of inflammatory rhetoric, however, is misconduct. *State v. Belgarde*, 110 Wn.2d 504, 507-08, 755 P.2d 174 (1988). Similarly, prejudicial allusions to matters outside the evidence are improper because they encourage the jury to render a verdict based on something other than the admitted evidence. *Id.* at 507 (quoting *State v. Belgarde*, 46 Wn. App. 441, 448, 730 P.2d 746 (1986)).

The prosecutor's arguments here were not improper. His reference to Mr. Prado obtaining a "scrap killer tag" was made in the context of establishing the gang aggravator. RP at 673. During closing, he emphasized that Mr. Prado's motive in shooting Mr. Parren and Ms. Deckard was to benefit Mr. Prado's gang. He argued to the jury:

> [Y]ou have to determine . . . whether the defendant committed the crime with the intent to directly or indirectly cause any benefit, aggrandizement, gain, profit or other advantage to or for a criminal street gang, its reputation, influence or membership.
>     Obviously in this case that's what it's all about. The whole motivation for shooting Mr. Parren and Ms. Deckard is to get stripes, to shoot some scraps, to get your scrap killer tag. That's what this is all about.

RP at 673.

This was not inflammatory in light of the extensive gang evidence produced at trial. The jurors were instructed that the lawyers' arguments "are intended to help you understand the evidence and apply the law." CP at 80. They were further instructed to

47

"disregard any remark, statement, or argument that is not supported by the evidence or the law." CP at 80. The evidence at trial established that "scrap" is a term of disrespect and that one of the goals of a gang member is to assault rival gang members. The prosecutor's argument was merely a recitation of previously admitted evidence, and therefore was not an improper plea to the jury's passions. By asserting that Mr. Prado was obtaining a "scrap killer tag," the prosecutor was asking the jury to find that the gang aggravator had been established.

The remaining statement at issue occurred when the prosecutor was summarizing Mr. Rivera's testimony regarding events after the shooting. The statement in context follows:

> [Mr. Rivera] says [Mr.] Prado says he shot the girl first and then he shot the scrap. They flee the area, and they know at that point the gang unit has been out to their houses. They've been looking for these guys.
> They are no dummies. They're getting phone contact because it's not the first rodeo probably with them. According to law enforcement, they're a known quantity. Their family is calling them up saying guess who's back out at the house.

RP at 684-85.

Viewed in context, the statement was not improper. Contrary to Mr. Prado's claim, the prosecutor was not referencing matters outside the record. He was reiterating witness testimony regarding the gang members' previous contacts with law enforcement.

48

This recitation of the evidence did not constitute misconduct. However, even if we were to find the statement improper, Mr. Prado failed to object or request a curative instruction. The statement was not so "flagrant and ill intentioned" that a curative instruction, had Mr. Prado requested one, would have been futile.

## IV. *Missing Witness Instruction*

Mr. Prado also claims the trial court erred in giving a "missing witness" jury instruction. He contends that his alibi witness, Isabel Torres, was not "particularly available" to him as a witness and that he provided a satisfactory explanation for her absence. Br. of Appellant at 38.

Over defense counsel's objection, the trial court gave a missing witness instruction as follows:

> If a person who could have been a witness at the trial is not called to testify, you may be able to infer that the person's testimony would have been unfavorable to a party in the case. You may draw this inference only if you find that:
> (1) The witness is within the control of, or peculiarly available to, that party;
> (2) The issue on which the person could have testified is an issue of fundamental importance, rather than one that is trivial or insignificant;
> (3) As a matter of reasonable probability, it appears naturally in the interest of that party to call the person as a witness;
> (4) There is no satisfactory explanation of why the party did not call the person as a witness; and
> (5) The inference is reasonable in light of all the circumstances.

CP at 88.

The trial court's instruction accurately stated the missing witness doctrine: Where a party fails to call a witness the party would properly be expected to call as part of its case, and the witness is peculiarly available to the party, the jury may draw an inference that the witness's testimony would be adverse to that party. *State v. Flora*, 160 Wn. App. 549, 556-57, 249 P.3d 188 (2011). In *State v. Montgomery*, 163 Wn.2d 577, 598-99, 183 P.3d 267 (2008), the court held the State is entitled to argue the missing witness inference if: (1) the missing witness is not equally available to the State, (2) the defendant does not satisfactorily explain the witness's absence, (3) the inference would not shift the burden of proof, and (4) the witness's testimony would be material and not cumulative. We review the trial court's giving a missing witness instruction for an abuse of discretion. *State v. David*, 118 Wn. App. 61, 67, 74 P.3d 686 (2003), *modified on remand*, 130 Wn. App. 232, 122 P.3d 764 (2005).

The trial court here addressed the *Montgomery* factors, finding that Ms. Torres was "peculiarly available" to Mr. Prado because she appeared in photographs with Mr. Prado and had been identified as a friend of Mr. Prado and other La Raza members. RP at 630. The court also cited the fact that Mr. Prado had been in contact with her and was trying to procure her testimony. The court noted that the material witness warrant was not served

50

even though Ms. Torres's testimony was central to the case, stating "[i]t would be unthinkable that she would not have been called if she would, in fact, have placed him in another location." RP at 631. Finally, the court found that Mr. Prado's explanation for Ms. Torres's absence was not satisfactory. When the defense reiterated the reasons for her absence—work conflicts, transportation problems, a child—the court responded, "[g]iven the gravity of the offense, I don't consider that to be a satisfactory explanation." RP at 632.

The trial court did not abuse its discretion in giving the missing witness instruction. Mr. Prado's defense was that he was at Ms. Torres's house during the shootings. During trial, he asserted that she was going to be his "main witness." RP at 470. As his alibi witness, her testimony was critical to his defense, such that her absence would lend itself to the inference that her testimony would not be favorable. Moreover, Ms. Torres was a friend of Mr. Prado's and others in the La Raza gang. During trial, defense counsel advised the court that he was still "working on Ms. Torres," and that he was expecting her to testify, despite transportation problems. RP at 469. When Mr. Prado asked for a material witness warrant, he asserted that he was the party who had access to her, but that she was not cooperating. He explained that he had made telephone calls, but that she never contacted him. When defense counsel eventually made

contact with her, Ms. Torres told him she would not be attending the trial, citing transportation and employment problems.

In view of the evidence, Ms. Torres was more available to Mr. Prado than the State. A witness's equal availability does not turn on whether he is subject to the subpoena power; it may turn on whether one party has a superior knowledge of the witness's identity. *State v. Blair*, 117 Wn.2d 479, 490, 816 P.2d 718 (1991) (quoting *Davis*, 73 Wn.2d at 277). Given the significance of Ms. Torres's testimony, Mr. Prado's failure to call her reasonably leads to the inference that her testimony would have been damaging.

V. *Lesser Included Instruction*

Mr. Prado next contends that the court erred by instructing the jury on the lesser included offense of attempted second degree murder in count 1. Initially, defense counsel requested the lesser included instruction, subject to discussion with Mr. Prado. Later, defense counsel indicated that after consultation with Mr. Prado, his client wanted to withdraw the request. During discussion of the jury instructions, defense counsel argued:

> I would like to argue against [the lesser included instruction], but second degree murder is a lesser included offense of first degree murder. You take the factors in this case and work them through the *Workman*[5] test. The legal issues, all the elements of one are contained in the other. If you

---

[5] *State v. Workman*, 90 Wn.2d 443, 447-48, 584 P.2d 382 (1978).

commit the first you're necessarily committing the second.

. . . [U]nfortunately, your Honor, I don't have a lot to argue with here. That's one of the reasons I originally was proposing a lesser included instruction on both counts.

RP at 621.

The court concluded the evidence justified the instruction, reasoning:

I think there is an inference that only the lesser would be included, which would provide or satisfy the factual prong.

Based on the testimony of Mr. Rivera, there is clearly an inference that only attempted second degree murder was committed, that there was no premeditation. [A]ccording to Mr. Rivera, [Mr. Prado] said I'm going to light him up, did not say them. There is a reference only to the male. So . . . the deliberation that I referenced earlier was only applied to Mr. Parren.

RP at 621-22.

The court instructed the jury as follows:

The defendant is charged in Count 1 with the crime of Attempted First Degree Murder. If after full and careful deliberation on this charge, you are not satisfied beyond a reasonable doubt that the defendant is guilty, then you will consider whether the defendant is guilty of the lesser crime of Attempted Second Degree Murder.

When a crime has been proven against a person and there exists a reasonable doubt as to which of two or more degrees that person is guilty, he shall be convicted only of the lowest degree.

CP at 96 (instruction 17).

By statute, either party in a criminal case is entitled to an instruction on a lesser

included offense in a criminal case. RCW 10.61.006;[6] *State v. Tamalini*, 134 Wn.2d 725,

728, 953 P.2d 450 (1998). An instruction on a lesser included offense is warranted when

"[f]irst, each of the elements of the lesser offense must be a necessary element of the

offense charged [and second], the evidence in the case must support an inference that the

lesser crime was committed." *State v. Workman*, 90 Wn.2d 443, 447-48, 584 P.2d 382

(1978). These are known as the "legal" and "factual" prongs. *State v. Berlin*, 133 Wn.2d

541, 545-46, 947 P.2d 700 (1997). Legally, second degree murder is a lesser included

offense of first degree murder. *State v. Mullins*, 158 Wn. App. 360, 371, 241 P.3d 456

(2010). Thus, the legal prong of the *Workman* standard is met. "If the evidence would

permit a jury to rationally find a defendant guilty of the lesser offense and acquit him of

the greater, a lesser included offense instruction should be given." *State v. Warden*, 133

Wn.2d 559, 563, 947 P.2d 708 (1997). The factual prong is met because there is evidence

showing that the lesser crime was committed. As the trial court pointed out, Mr. Rivera

testified that Mr. Prado only referenced shooting Mr. Parren, not Ms. Deckard. Thus, the

State had scant evidence of premeditation regarding Ms. Deckard. The State was entitled

---

[6] RCW 10.61.006 states that "[i]n all other cases the defendant may be found guilty of an offense the commission of which is necessarily included within that with which he or she is charged in the indictment or information."

54

to the lesser included instruction.

The trial court did not err in giving the lesser included instruction.

VI. *Ineffective Assistance of Counsel*

Finally, Mr. Prado contends that trial counsel was ineffective for failing to object to the prior bad acts evidence under ER 404(b), failing to object to the prosecutor's closing argument, and failing to request an offer of proof regarding the qualifications of the gang experts. He contends that without the improper propensity evidence and gang related testimony, there is a reasonable probability he would have had a different result at trial. As noted above, the expert gang evidence testimonies were properly admitted. We, therefore, restrict the below analysis to the ER 404(b) evidence and the prosecutor's closing statement—"not the first rodeo" remark.

To prevail on an ineffective assistance of counsel claim, Mr. Prado must show both deficient performance and resulting prejudice. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). Counsel's performance is deficient if it fell below an objective standard of reasonableness. *State v. Stenson*, 132 Wn.2d 668, 705, 940 P.2d 1239 (1997). Our scrutiny of counsel's performance is highly deferential; we strongly presume reasonableness. *State v. McFarland*, 127 Wn.2d 322, 335, 899 P.2d 1251 (1995). To rebut this presumption, a defendant bears the burden of establishing the

absence of any conceivable legitimate tactic explaining counsel's performance. *State v. Grier*, 171 Wn.2d 17, 33, 246 P.3d 1260 (2011) (quoting *State v. Reichenbach*, 153 Wn.2d 126, 130, 101 P.3d 80 (2004)). To establish prejudice, a defendant must show a reasonable probability that the trial outcome would have differed absent the deficient performance. *State v. Thomas*, 109 Wn.2d 222, 226, 743 P.2d 816 (1987) (quoting *Strickland*, 466 U.S. at 694). If an ineffective assistance claim fails to support a finding of either deficiency or prejudice, it fails. *Strickland*, 466 U.S. at 697 ("If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed. Courts should strive to ensure that ineffectiveness claims not become so burdensome to defense counsel that the entire criminal justice system suffers as a result.").

Mr. Prado fails to establish prejudice. In view of Mr. Rivera's testimony, Mr. Prado's inconsistent statements concerning his presence at the Conoco station, and Mr. Prado's statement to Mr. Rivera that the latter was a snitch (rather than a liar), even if we deem defense counsel's performance deficient, Mr. Prado is unable to show a reasonable probability that the trial outcome would have differed. Thus, his ineffective assistance of counsel claim fails.

No. 31275-5-III
*State v. Prado*

STATEMENT OF ADDITIONAL GROUNDS FOR REVIEW (SAG)

Mr. Prado raises two additional grounds in his SAG. He first asserts that the trial court erred by denying his motion to remove a relative of one of the investigating detectives from the jury. An appellant is required to provide all information necessary for our review of an issue, and we may refuse to decide an issue where the record is incomplete. RAP 9.2(b); *State v. McFarland*, 127 Wn.2d 322, 338, 899 P.2d 1251 (1995) (appellate court will not consider matters outside the record). Here, the transcript of jury selection is not a part of the record submitted on appeal. Without a record of voir dire, we are unable to review Mr. Prado's contention.

Second, Mr. Prado contends that the trial court erred by denying his request to replace defense counsel with another attorney. He asserts that he asked the court to replace his assigned attorney based on ineffective assistance of counsel. This claim is insufficiently argued. Although RAP 10.10(c) states that reference to the record and citation to authorities are not required in statements of additional grounds for review, the rule also states that the appellate court will not consider the SAG for review if it does not inform the court of the nature and occurrence of the alleged errors. Here, not only does Mr. Prado fail to cite to the relevant portions of the record, he does not explain how assigned counsel's performance was deficient or why the trial court's ruling was

57

erroneous. Without additional information or argument, we cannot address the issue.

We affirm.

A majority of the panel has determined this opinion will not be printed in the

Washington Appellate Reports, but it will be filed for public record pursuant to

RCW 2.06.040.

_____
Lawrence-Berrey, J.

WE CONCUR:

_____ _____
Brown, A.C.J.         Korsmo, J.